277 P.3d 198

**HELVETICA SERVICING, INC., a California corporation fna CRM Venture Law, Inc. dba The Helvetica Group, Plaintiff/Appellee,**

v.

**Michael S. PASQUAN, an individual, Defendant/Appellant.**

**No. 1 CA–CV 10–0418.**

Court of Appeals of Arizona, Division 1, Department C.

March 20, 2012.

---

Buchalter Nemer, P.C. by Donnelly A. Dybus, Scottsdale, Christopher F. McCarthy, Jason E. Goldstein, Pro Hac Vice, Irvine, CA, Attorneys for Plaintiff/Appellee.

Berens Kozub Kloberdanz & Blonstein, P.L.C. by Daniel L. Kloberdanz, William A. Kozub, Scottsdale, Attorneys for Defendant/Appellant.

## OPINION

DOWNIE, Judge.

¶ 1 This case requires us to examine the scope of statutory anti-deficiency protection available to borrowers in the judicial foreclosure context. We hold that refinancing a purchase money loan does not destroy purchase money status and forfeit anti-deficiency protection to the extent proceeds from the refinancing transaction are disbursed in satisfaction of the underlying purchase money obligation. We further hold that loan proceeds used to construct a qualifying residence merit anti-deficiency protection under certain circumstances. However, sums disbursed in a loan transaction for non-purchase money purposes may be traced, segregated, and recovered in a deficiency action. Because the superior court did not apply these legal standards to the various loan transactions at issue in this case, we vacate the deficiency judgment entered against appellant Michael Pasquan and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 Michael and Kelly Pasquan purchased a 4000–square–foot home in Paradise Valley (the "Property") in May 2003. To satisfy the $935,000 purchase price, the Pasquans made a $335,000 cash payment and obtained a

$600,000 loan from Hamilton Mortgage Company ("Hamilton Loan"). The Hamilton Loan was secured by a deed of trust recorded against the Property.

¶ 3 In December 2004, the Pasquans obtained a $1.6 million loan from Desert Hills Bank ("Desert Hills"). The Desert Hills loan proceeds paid off the Hamilton Loan and also funded the demolition of most of the existing residence and the construction of an 11,500–square–foot home in its place. The Desert Hills loan was secured by a new deed of trust recorded against the Property.

¶ 4 The Pasquans later borrowed an additional $100,000 from Desert Hills. No new deed of trust was recorded; the additional amount was secured by the existing deed of trust on the Property. Subsequently, the Pasquans obtained an additional $400,000 loan from Desert Hills that was secured by a second recorded deed of trust. According to a declaration submitted by Michael Pasquan in the superior court, all of the Desert Hills loan proceeds were used for construction expenses.

¶ 5 In September 2006, the Pasquans obtained a $3.4 million loan serviced by appellee Helvetica Servicing, Inc. ("Helvetica Loan").[1] The Helvetica Loan was secured by a new deed of trust recorded against the Property. According to Michael Pasquan's declaration, the Helvetica Loan proceeds were disbursed as follows:

| | |
|---|---|
| Desert Hills Payoff | $2,154,038 |
| Stephen Pasquan Loan [2] | $225,000 |
| Closing Costs | $9,674 |
| Points/Interest | $274,894 |
| Interest/Reserves | $206,033 |
| Construction Credit Cards | $172,575 |
| Net Proceeds to the Pasquans | $357,786.15 |

Pasquan avowed that roughly $228,000 of the funds he and his wife received at closing went toward interest payments on the Helvetica Loan, with the remainder being used for "improvements, landscaping, maintenance, taxes, utilities and marketing fees for the house."

---

1. There are numerous beneficiaries under the Helvetica deed of trust. We refer to them collectively as "Helvetica."

2. The Pasquans reportedly borrowed $225,000 from Stephen Pasquan, Michael's father, for construction expenses.

¶ 6 The Pasquans defaulted on their loan payments, and Helvetica filed a judicial foreclosure action. The superior court granted partial summary judgment to Helvetica regarding its right to foreclose and the principal sum owed by the Pasquans—$3,657,793.30. The court reserved the question of whether Helvetica could obtain a deficiency judgment.

¶ 7 Helvetica purchased the Property with a $400,000 credit bid at a sheriff's sale. Thereafter, the parties briefed the applicability of Arizona's anti-deficiency statutes. The superior court ruled in favor of Helvetica and entered a deficiency judgment against the Pasquans in the sum of $1,936,825.53, plus pre-judgment and post-judgment interest. Michael Pasquan timely appealed.[3]

## DISCUSSION

¶ 8 The overarching issue in this case is whether the Helvetica Loan is a purchase money obligation. If it is, Helvetica may not obtain a deficiency judgment against Pasquan. *See Baker v. Gardner*, 160 Ariz. 98, 107, 770 P.2d 766, 775 (1989) (supplemental opinion) ("By choosing judicial foreclosure, the creditor can obtain a deficiency judgment in all cases except those dealing with purchase money collateral on the residential property described in § 33–729(A)."). A deficiency judgment "is nothing more than the difference between the security and the debt."[4] *Valley Nat'l Bank of Ariz. v. Kohlhase*, 182 Ariz. 436, 440, 897 P.2d 738, 742 (App.1995) (quoting *Baker*, 160 Ariz. at 104 n. 7, 770 P.2d at 772 n. 7).

¶ 9 The Arizona legislature enacted statutes in 1971 to protect certain borrowers against deficiency judgments arising from purchase money mortgages and purchase money deeds of trust foreclosed judicially. *Baker*, 160 Ariz. at 101, 770 P.2d at 769. This legislation was intended to "protect[ ]

consumers from financial ruin" and "eliminat[e] ... hardships resulting to consumers who, when purchasing a home, fail to realize the extent to which they are subjecting assets besides the home to legal process." *Id.* (quoting Boyd & Balentine, *Arizona's Consumer Legislation: Winning The Battle but ...*, 14 Ariz. L.Rev. 627, 654 (1972)). Anti-deficiency protection reflects a legislative policy decision to place the risk of inadequate security on lenders rather than borrowers. *Id.* at 103, 770 P.2d at 771. It is intended to discourage purchase money lenders from over-valuing real property by requiring them to look solely to the collateral for recovery in the event of foreclosure.

¶ 10 The statute at issue in this case, Arizona Revised Statute ("A.R.S.") section 33–729(A), reads:

> [I]f a mortgage is given to secure the payment of the balance of the purchase price, or to secure a loan to pay all or part of the purchase price, of a parcel of real property of two and one-half acres or less which is limited to and utilized for either a single one-family or single two-family dwelling, the lien of judgment in an action to foreclose such mortgage shall not extend to any other property of the judgment debtor, nor may general execution be issued against the judgment debtor to enforce such judgment, and if the proceeds of the mortgaged real property sold under special execution are insufficient to satisfy the judgment, the judgment may not otherwise be satisfied out of other property of the judgment debtor, notwithstanding any agreement to the contrary.

¶ 11 We review the interpretation and application of statutes *de novo*. *Schwarz v. City of Glendale*, 190 Ariz. 508, 510, 950 P.2d 167, 169 (App.1997) (citation omitted). Our goal in interpreting a statute is to determine and give effect to legislative intent.

---

3. The Pasquans divorced in 2009. Kelly Pasquan is not a party to this appeal. References to "Pasquan" are to Michael Pasquan individually.

4. The parties agree that a deficiency exists, though they disputed the amount in the superior court. After an evidentiary hearing, the court set the fair market value of the Property at $2,266,666.67. *See* Ariz.Rev.Stat. ("A.R.S.")

§ 33–814(A) (a deficiency judgment "shall be for an amount equal to the sum of the total amount owed the beneficiary as of the date of the sale, as determined by the court less the fair market value of the trust property on the date of the sale as determined by the court or the sale price at the trustee's sale, whichever is higher").

*Mail Boxes, Etc., U.S.A. v. Indus. Comm'n,* 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995) (citation omitted). We begin with the statute's language. *Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co.,* 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994) (citations omitted). If the language is unambiguous, we do not employ other tools of statutory construction. *Janson v. Christensen,* 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991) (citations omitted).

¶ 12 The parties agree that the Hamilton Loan, which was obtained to acquire the Property, was a purchase money obligation. Helvetica contends, though, that by refinancing a purchase money loan, a borrower destroys purchase money status, forfeiting anti-deficiency protection. Pasquan, on the other hand, argues: (1) the Desert Hills loans were construction loans that are purchase money in nature; and (2) the Helvetica Loan refinanced an existing purchase money loan and is therefore a purchase money obligation.[5]

**I. The Effect of Refinancing**

¶ 13 Both parties rely on this Court's decision in *Bank One, Arizona v. Beauvais,* 188 Ariz. 245, 934 P.2d 809 (App.1997), to support their respective positions. In *Bank One,* the borrowers obtained a loan from Bank One to exercise stock options, pledging the stock as collateral. *Id.* at 246, 934 P.2d at 810. They later sought another loan from Bank One to purchase a home. *Id.* The new loan consolidated the first loan with the home purchase loan into a single note. *Id.* The consolidated loan proceeds paid off the first loan and funded the home's purchase. *Id.* The consolidated loan was secured by the stock and a deed of trust. *Id.*

¶ 14 When the borrowers were unable to pay, they executed a "workout note" that satisfied the consolidated loan. *Id.* The workout note was secured by the stock and the existing deed of trust. *Id.* The borrowers defaulted, and Bank One sued them. *Id.* at 246–47, 934 P.2d at 810–11. The bank argued the workout note was not a purchase money obligation, but a new and independent loan used to pay existing obligations. *Id.* at

247, 934 P.2d at 811. Alternatively, Bank One argued it could recover the pro rata portion of the workout note that was not purchase money in nature. *Id.*

¶ 15 The superior court ruled that the workout note was a purchase money obligation and found no basis for apportioning between purchase money and non-purchase money funds. *Id.* Bank One appealed. *Id.* This Court held that, regardless of whether the workout note was "an extension, renewal, or new obligation," it was a purchase money obligation. *Id.* at 248–51, 934 P.2d at 812–15. Citing *Baker,* we observed that anti-deficiency protection is intended "to protect certain homeowners from the financial disaster of losing their homes to foreclosure plus all their other nonexempt property on execution of a judgment for the balance of the purchase price." *Id.* at 249, 934 P.2d at 813. We concluded:

> [T]he legislature did not intend that a loan would lose its character as a purchase-money obligation when, as here, it is extended, renewed, or the remaining portion of the original loan is refinanced and the deed of trust on the property that was bought with the original loan continues or is renewed. Given the realities of the marketplace, to believe otherwise would put many homeowners, unable to make mortgage payments, at the peril of facing personal liability as well as the loss of their homes-a result the legislature intended to avoid through the Anti–Deficiency Statutes.

*Id.* at 250, 934 P.2d at 814. *Bank One* did not address the propriety of segregating non-purchase money portions of a loan, noting the bank had abandoned its argument that such funds should be traced and included in a deficiency judgment. *Id.* at 248 n. 2, 934 P.2d at 812 n. 2.

¶ 16 Helvetica ascribes significance to two factual differences between this case and *Bank One:* (1) the original deed of trust the Pasquans executed when purchasing the Property was replaced by deeds of trust in favor of the subsequent lenders; and (2)

---

5. Pasquan raises other issues in his opening brief that Helvetica has not addressed, characterizing them as "irrelevant to this appeal." For purposes of our decision, we assume the Property is of a size and use meriting protection under A.R.S. § 33–729(A).

different lenders are involved. We agree that these factual distinctions exist, but we do not read *Bank One* as requiring that the original deed of trust remain in place or that the lender remain the same in order to preserve purchase money status. *Bank One* addressed the facts before it and did not attempt to define the outer limits of anti-deficiency protection.

¶ 17 The court in *Bank One* held that the character of a purchase money obligation is not changed when it is refinanced and the "deed of trust on the property that was bought with the original loan continues *or is renewed.*" *Id.* at 250, 934 P.2d at 814 (emphasis added). "Renew" can mean "to replace" or "to begin again." Black's Law Dictionary 1296 (6th ed. 1990). Section 33–729(A) does not mandate that the lender remain the same or that the deed of trust of record at the time of foreclosure be the same one recorded when the property was purchased. The statute instead accords protection if a mortgage is "given to secure the payment of the balance of the purchase price, or to secure a loan to pay all or part of the purchase price."

¶ 18 In the case at bar, a portion of the first Desert Hills loan proceeds satisfied the balance due on the Hamilton Loan. That disbursement paid "the balance of the purchase price." A.R.S. § 33–729(A). A deed of trust on the same property secured the Hamilton and Desert Hills loans.

¶ 19 A change in the lender's identity does not, standing alone, alter the nature of the underlying purchase money debt. To hold that refinancing a purchase money obligation with a new lender and executing a new deed of trust on the same property destroys anti-deficiency protection would contravene the legislative intent to "abolish the personal liability of persons who give trust deeds encumbering properties that fit within the statutory definition." *Bank One,* 188 Ariz. at 249, 934 P.2d at 813 (citing *Baker,* 160 Ariz. at 104, 770 P.2d at 772). Moreover, it would be anomalous to conclude that an original lender who refinances an acquisition loan at a lower interest rate cannot pursue a deficiency judgment, as *Bank One* instructs, but a new lender who pays off that original loan in a refinancing transaction may do so.

¶ 20 A determination that refinancing does not destroy purchase money status is also consistent with the policy of discouraging the over-valuation of real property. The risk of over-valuation is arguably even more substantial in the refinancing context, where property values are not based on actual sales of the collateral. The second rationale for anti-deficiency legislation—preventing financial ruin of homeowners who have already lost their homes and the attendant drain on the economy—is also furthered by protecting refinancing transactions, which frequently occur in distressed economic climates.

¶ 21 Helvetica's reliance on *Union Bank v. Wendland,* 54 Cal.App.3d 393, 126 Cal.Rptr. 549 (1976), is unpersuasive. In *Union Bank,* the homeowner financed the purchase of residential property by borrowing from a savings and loan. *Id.* at 554. He later obtained three additional loans from a bank. *Id.* at 552. The first bank loan was secured by a deed of trust; some of the proceeds were used to satisfy the original purchase money loan, and the remainder went into the homeowner's account. *Id.* at 554. The second loan was used to remodel the residence; the third loan paid off the second loan and made payments due under the first note. *Id.* at 552. The California Court of Appeal held that refinancing is not a purchase money transaction because the loan proceeds are not used to purchase a residence. *Id.* at 554. Accordingly, by refinancing the property, the homeowner destroyed purchase money status and was subject to a deficiency judgment. *Id.*

¶ 22 The decision in *Union Bank* has been criticized. *See, e.g.,* Carol Burns, Comment, *Will Refinancing Your Home Mortgage Risk Your Life Savings ?: Refinancing and California Code of Civil Procedure Section 580B,* 43 UCLA L.Rev. 2077, 2095 (1996) ("As an appellate level decision, Union Bank's value as a precedent is limited. Further, the court's flawed reasoning weakens its value even as persuasive authority."); Charles B. Sheppard, *California Code of Civil Procedure Section 580B, Anti–Deficiency Protection Regarding Purchase Money Debts: Ar-*

guments for the Inclusion of Refinanced Purchase Money Obligations Within the Anti–Deficiency Protection of Section 580B, 6 S. Cal. Interdisc. L.J. 245, 269 (1997) (labeling Union Bank's holding that refinancing destroys purchase money status "dicta" and "misguided"). Union Bank is also inconsistent with our own Arizona precedent—specifically, Bank One, which holds that refinancing does not necessarily convert a purchase money obligation into a recourse loan.

¶ 23 We hold that the first Desert Hills loan transaction did not destroy the purchase money status of Pasquan's obligation, at least to the extent of loan proceeds used to satisfy the Hamilton Loan. We next consider whether proceeds from the Desert Hills loans that were disbursed for other purposes, including construction of the residence, merit different treatment.

## II. Construction Loans as Purchase Money Obligations

¶ 24 No Arizona appellate decision has addressed whether so-called "construction loans" used to build a residence are purchase money obligations entitled to anti-deficiency protection. In Southwest Savings and Loan Association v. Ludi, 122 Ariz. 226, 227, 594 P.2d 92, 93 (1979), the homeowners assumed a note secured by a purchase money mortgage and a note for a "property improvement loan" secured by a second mortgage. They defaulted on both. Id. The Ludis argued that because they assumed the two mortgages when purchasing the property, both were purchase money obligations, precluding a deficiency judgment. Id. at 228, 594 P.2d at 94. Addressing only the property improvement loan, our supreme court disagreed, stating:

In order to determine whether the Ludis may claim any benefit from [the anti-deficiency] statute as a result of their assumption, we must look to the rights given them by their grantor.... [The grantor] gave Southwest a second mortgage and note, not for purchase money, but for a property improvement loan. That mortgage is clearly not covered by the statute.

Id.

¶ 25 Ludi did not discuss the nature of the property improvement loan or how its proceeds were used.[6] There was no contention that, as to the original borrower, the second mortgage was a purchase money obligation. And because the Ludis stepped into the original borrower's shoes, they could not elevate the loan's status to a purchase money obligation.

¶ 26 Notwithstanding the decision in Ludi, we deem it an open question in Arizona whether a loan that funds construction of a statutorily qualifying residence is a purchase money obligation. And although we reject the holding in Union Bank as incompatible with Arizona law, we find guidance in a different California appellate decision relevant to construction loans. See Baker, 160 Ariz. at 102–03, 770 P.2d at 770–71 (because California has similar anti-deficiency laws, its appellate decisions are instructive in interpreting Arizona statutes).

¶ 27 In Prunty v. Bank of America, 37 Cal.App.3d 430, 112 Cal.Rptr. 370 (1974), the court considered whether a lender could obtain a deficiency judgment based on a loan it made to fund construction of a residence on land the borrower already owned. The bank argued the construction loan financed improvements to the property, not its purchase, so a deficiency judgment was proper. Id. at

6. Considering the policies behind Arizona's anti-deficiency legislation, we perceive significant differences between construction loans used to build residences and loans obtained to improve existing homes. Cf. Allstate Sav. & Loan Ass'n v. Murphy, 98 Cal.App.3d 761, 159 Cal.Rptr. 663, 664 (1979) (construing an analogous California statute and holding that "construction loans for improvements or repairs of the type involved in this case [construction of a swimming pool and block wall] are not within the description of loans protected by the purchase-money deficiency prohibition"). The second scenario, though, is not before us. In some cases, it will be a question of fact whether a particular transaction is a construction loan or some different type of obligation—e.g., a home improvement loan. Although the record before us suggests that a substantial portion of the Desert Hills financing is properly characterized as a construction loan, the superior court will be required to make this determination on remand. Because the parties have not raised or briefed the issue on appeal, we do not now undertake to define the characteristics of a protected construction loan.

373. The court, though, ruled that the public policies behind anti-deficiency legislation warranted protection for "residential construction borrowers who fall within its terms." *Id.* at 377. The court found certain undisputed facts significant in that case, including the following:

7. It was intended both by plaintiffs and defendants that the repayment of said loan would be secured by said deed of trust which would cover not only the land but also a dwelling to be constructed thereon. 8. At the time of the application for said loan and at the time of the execution and recording of said deed of trust, plaintiffs intended to use the proceeds of said loan to construct a single family residential dwelling on the property, which they themselves would occupy, and defendant Bank of America was aware and intended that the proceeds of said loan would be so used. 9. All the proceeds of said loan were used by plaintiffs to pay the purchase price of labor and materials which were used in constructing a single family residence on the property. 10. Defendant Bank of America would not have made said loan had not the entire proceeds of said loan been used to pay the purchase price of labor and materials used to construct the residence on said land. 11. Defendant Bank of America looked primarily to the land and to the building thereon as security for its loan.

*Id.* at 372.

¶ 28 *Prunty* looked to the legislative history behind California's statutes, noting that courts "have exhibited a very hospitable attitude toward the legislative policy underlying the antideficiency legislation and have given it a broad and liberal construction that often goes beyond the narrow bounds of the statutory language." 112 Cal.Rptr. at 374 (citing Stefan A. Riesenfeld, *California Legislation Curbing Deficiency Judgments*, 48 Calif. L.Rev. 705, 709 (1960)). The court held that common definitions of the words "purchase" and "purchaser" are broad enough to encompass construction loans, stating:

[T]he owner of real property who finances and builds a "dwelling" on it "acquires" or "obtains" the dwelling for a "price," in no

less a sense than the "purchaser" of real property "acquires" or "obtains" the land itself. . . . Thus, the terms actually used by the Legislature . . . ("purchase price" and "purchaser") may reasonably be assigned the suggested alternative definitions "according to the usual, ordinary import" of the statutory language. The reach of that language is therefore to be assessed according to a liberal construction thereof in light of the legislative purpose underlying the amended statute and the "entire statutory system" of anti-deficiency legislation which includes it.

*Id.* at 376–77 (citations omitted). The court concluded:

The critical fact here is not . . . that the character of the property purchased under a construction Contract is to be determined at the time of execution thereof; it is whether the parties to the construction Loan intended that the deed of trust, securing the loan's payment, cover Real property.

*Id.* at 379 (internal citations omitted).

¶ 29 We agree with *Prunty* and find its analysis and conclusion equally applicable to and consistent with Arizona's legislative scheme. *See, e.g., Cely v. DeConcini, McDonald, Brammer, Yetwin & Lacy, P.C.,* 166 Ariz. 500, 504, 803 P.2d 911, 915 (App.1990) ("The purposes served by Arizona's mortgage anti-deficiency statute are identical to those served by California's statute . . . ."); *see also* A.R.S. § 1–213 ("Words and phrases shall be construed according to the common and approved use of the language."); *W. Corr. Grp., Inc. v. Tierney,* 208 Ariz. 583, 587, ¶ 17, 96 P.3d 1070, 1074 (App.2004) (citing *State v. Wise,* 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983)) (in determining the plain meaning of a term in a statute, courts refer to established and widely used dictionaries).

¶ 30 Like California, *see Prunty,* 112 Cal.Rptr. at 375, our anti-deficiency statutes allocate the risk of inadequate security to purchase money lenders, thereby discouraging overvaluation of the collateral. Additionally, as in California, "[i]f inadequacy of the security results, not from overvaluing,

but from a decline in property values during a general or local depression, [the anti-deficiency statute] prevents the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability." *Id.*

¶ 31 Construing anti-deficiency protection to apply to construction loans furthers these legislative policies. *See State v. Clary*, 196 Ariz. 610, 612, ¶ 9, 2 P.3d 1255, 1257 (App. 2000) (citing *Carrow Co. v. Lusby*, 167 Ariz. 18, 21, 804 P.2d 747, 750 (1990)) (courts consider the policy behind the law and the evil it was intended to remedy when interpreting statutes). Such protection will "tend[ ] to discourage construction borrowing which is 'unsound' because the financed construction is overvalued." *Prunty*, 112 Cal.Rptr. at 377. It also avoids further aggravation of a depressed economy. *Cf.* Burns, Comment, 43 UCLA L.Rev. at 2089 ("Rampant personal judgments against debtors would greatly exacerbate the economic downturn and hinder recovery. To prevent such a catastrophe, the legislature mandated that the losses be distributed: The debtor loses the property, and the lender forfeits the amount by which the debt exceeds the property's fair value.").

¶ 32 We hold that a construction loan qualifies as a purchase money obligation if: (1) the deed of trust securing the loan covers the land *and* the dwelling constructed thereon; and (2) the loan proceeds were in fact used to construct a residence that meets the size and use requirements set forth in A.R.S. § 33–729(A). In the case at bar, these are questions of fact that must be resolved by the superior court on remand.

### III. Treatment of Non–Purchase Money Funds

¶ 33 Finally, this case presents a question left unanswered in *Bank One:* whether non-purchase money loan funds included in a purchase money transaction may be traced and segregated, according anti-deficiency

protection only to the purchase money amounts.

¶ 34 Pasquan's declaration makes clear that not all of the Helvetica Loan proceeds were disbursed to pay either the remaining purchase price of the Property or construction costs. His declaration identifies payments that clearly are not purchase money in nature, including sums for maintenance, utilities, marketing fees, and penalties.[7]

¶ 35 There are three possible outcomes when a judicially foreclosed mortgage secures both purchase money and non-purchase money sums: (1) the entire loan is a recourse obligation; (2) the entire amount receives anti-deficiency protection; or (3) non-purchase money sums may be traced, segregated, and included in a deficiency judgment. Arizona's statutes offer little guidance regarding this issue. Relevant legislative history, though, persuades us that the third option is the most rational way of harmonizing the competing interests of borrowers and lenders and of giving effect to legislative intent.[8] *See* A.R.S. § 1–211(B) ("Statutes shall be liberally construed to effect their objects and to promote justice."); *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 270, 872 P.2d 668, 674 (1994) (citing *State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 254, 782 P.2d 727, 730 (1989)) (when a court cannot ascertain the legislature's intent on a specific issue, it attempts to interpret the statutes in a manner that furthers the perceived goals of the relevant body of legislation).

¶ 36 Although there is a dearth of case law authority addressing mortgages that commingle purchase money and non-purchase money sums, several legal commentators have explored the issue. In analyzing California's statutory scheme, one such commentator concluded:

> [R]efinanced purchase money obligations regarding owner-occupied residential property ought to be recognized as actually

7. The Helvetica Loan likely includes additional non-purchase money sums, including interest payments to Helvetica of $32,555 per month. However, the record on appeal is not sufficiently developed for us to opine further regarding this issue.

8. Pasquan himself acknowledges he is "not urging this Court to adopt a rule which protects a borrower who refinances a purchase money loan and takes out additional cash above and beyond paying off the existing purchase money obligations."

being within the purview of the purchase money, anti-deficiency protection of section 580b to the extent that proceeds from the refinance loan were used to pay-off the refinanced purchase money obligation. Any proceeds from the refinance loan that were used for purposes other than a pay-off of the refinanced purchase money obligation would not be funds which were used, in fact, to pay all or part of the purchase price of the property in question. To that extent, a borrower would be exposed to personal liability for a deficiency in an amount not to exceed the amount of the refinance loan that was used for purposes other than to pay-off the refinanced purchase money obligation.

Sheppard, 6 S. Cal. Interdisc. L.J. at 248.

¶ 37 We reach a similar conclusion. It appears unnecessarily punitive and contrary to the consumer-protection goals of Arizona's legislation to convert an entire obligation into a recourse loan simply because it happens to include non-purchase money sums. On the other hand, it seems similarly inappropriate to shield borrowers from deficiencies for loan disbursements unrelated to the acquisition or construction of a qualifying residence. Extending anti-deficiency protection in such a manner could encourage irresponsible borrowing and abdication of personal responsibility for repaying legitimate debt. It would also appear to stretch our anti-deficiency laws beyond the scope intended by the legislature. We therefore hold that, to the extent a judicially foreclosed mortgage includes both purchase money and non-purchase money sums, a lender may pursue a deficiency judgment for the latter amounts. If the legislature disagrees with our resolution of this admittedly murky issue, we presume it will amend the existing statutory scheme to make clear its intentions.

## CONCLUSION

¶ 38 We vacate the deficiency judgment entered against Pasquan and remand to the superior court for further appropriate proceedings. On remand, the court must resolve various issues, including:

1. The amount of the Hamilton Loan pay-off, which is entitled to anti-deficiency protection.

2. Whether the deeds of trust at issue cover the newly constructed residence.

3. Whether and to what extent loan proceeds, beginning with the first Desert Hills loan, were disbursed for construction of the residence and/or payment of the remaining purchase price of the Property.

4. The purposes for which the Helvetica Loan proceeds were disbursed.

5. The amount of a revised default judgment against Pasquan that includes only non-purchase money sums.

¶ 39 We do not foreclose consideration of other matters on remand. Given the procedural context of this case in the superior court, only limited issues have been litigated to date. For example, there is some suggestion that Helvetica disputes whether the Property's size and use merit protection under A.R.S. § 33–729(A). Additionally, it is unclear whether the factual assertions contained in Pasquan's declaration are disputed. Because Helvetica prevailed below on its claim that refinancing destroys purchase money status, such issues have not been litigated. Nothing in this opinion prevents their litigation on remand.

CONCURRING: DANIEL A. BARKER, Presiding Judge * and MICHAEL J. BROWN, Judge.

---

* Judge Daniel A. Barker was a member of this court when the matter was assigned to this panel. He retired effective December 31, 2011. In accordance with the authority granted by Article 6, Section 3, of the Arizona Constitution, and pursuant to A.R.S. § 12–145, the Chief Justice of the Arizona Supreme Court has designated Judge Barker as a judge *pro tempore* for the purpose of participating in the resolution of cases assigned during his term in office.