317 P.3d 641

**BMO HARRIS BANK N.A., as Successor to M & I Marshall & Ilsley Bank, Plaintiff/Appellant,**

v.

**WILDWOOD CREEK RANCH, LLC; Shaun F. Rudgear, and Kristina B. Rudgear, as husband and wife, Defendants/Appellees.**

No. 1 CA–CV 12–0728.

Court of Appeals of Arizona, Division 1.

Jan. 16, 2014.

As Amended Jan. 21, 2014.

Kessler, J., filed specially concurring opinion.

Stinson Morrison Hecker LLP By Jeffrey J. Goulder, Phoenix, Counsel for Plaintiff/Appellant.

Kercsmar & Feltus PLLC By Geoffrey S. Kercsmar, William T. Luzader and Julia A. Guinane, Scottsdale, Counsel for Defendants/Appellees.

Presiding Judge ANDREW W. GOULD delivered the opinion of the Court, in which Judge MICHAEL J. BROWN joined and Judge DONN KESSLER specially concurred.

## OPINION

GOULD, Judge.

¶ 1 BMO Harris Bank ("BMO") appeals the trial court's grant of partial summary judgment in favor of Wildwood Creek Ranch, LLC ("Wildwood"), and Shaun and Kristina Rudgear ("the Rudgears"). In making its ruling, the trial court relied on *M & I Marshall & Ilsley Bank v. Mueller*, 228 Ariz. 478, 268 P.3d 1135 (App.2011), and concluded the Rudgears' intent to build a home on the Property protected them from a deficiency judgment under Arizona Revised Statute

("A.R.S.") section 33–814(G) (Supp.2012).[1] Because we find that A.R.S. § 33–814(G) does not apply to vacant land, we reverse and remand to the trial court for entry of partial summary judgment in favor of BMO.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 In March 2006, Wildwood obtained a $296,200 loan ("the Loan") through BMO's predecessor in interest, M & I Marshall and Ilsley Bank. The Loan was secured by a deed of trust on an unimproved, vacant lot ("the Property"). The Rudgears personally signed the mortgage note, apparently on behalf of Wildwood, a limited liability company of which they are the sole members. The Rudgears also personally guaranteed the Loan.

¶ 3 The Loan was renewed in 2009, extending its maturity date to 2011. However, in April 2011, both Wildwood and the Rudgears defaulted on their obligations. BMO foreclosed on the Property through a trustee's sale and thereafter sued Wildwood and the Rudgears to obtain a deficiency judgment in the amount of the unpaid balance of the Loan.

¶ 4 Significantly, at no time was there any construction on the Property; it remained vacant throughout the term of the Loan until the time of the trustee's sale.

¶ 5 The parties cross-moved for partial summary judgment on all issues relating to the Rudgears' deficiency liability. The Rudgears argued that as a matter of law BMO was precluded from recovering the deficiency because they intended to build a single one-family dwelling on the Property. The Rudgears submitted affidavits avowing it was their intent to build a home on the Property and occupy it as their primary residence. In response, BMO offered evidence that the Rudgears owned three separate parcels, each of which they purportedly intended to use as their "primary residence."

¶ 6 The trial court granted summary judgment for Appellants. Relying on *Mueller,*

---

1. We cite to the current versions of statutes unless they have been materially amended since the proceedings below.

the court determined that no material evidence contradicted the Rudgears' affidavits, and that summary judgment was appropriate because the affidavits showed that the Rudgears intended to utilize the vacant Property as a single one-family dwelling. BMO timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. § 12–2101(A)(1) (Supp.2012).

## STANDARD OF REVIEW

¶ 7 Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a). We review a grant of summary judgment de novo and "view[ ] the evidence and reasonable inferences in the light most favorable to the party opposing the motion." *Andrews v. Blake*, 205 Ariz. 236, 240, ¶¶ 11, 12, 69 P.3d 7, 11 (2003).

## DISCUSSION

■ ¶ 8 This case involves construction of A.R.S. § 33–814(G), which provides that:

> If trust property of two and one-half acres or less *which is limited to and utilized for either a single one-family or a single two-family dwelling* is sold pursuant to the trustee's power of sale, no action may be maintained to recover any difference between the amount obtained by the sale and the amount of the indebtedness and any interest, costs and expenses.

(Emphasis added.) Under the terms of the statute, a party seeking protection from a deficiency judgment must prove the following: (1) the property was encumbered by a deed of trust; (2) the property consists of two and one-half acres or less; (3) the property is limited to and utilized for a single one-family dwelling or a single two-family dwelling; and (4) the property was sold at a trustee's sale. A.R.S. § 33–814(G).

■ ¶ 9 Here, there is no dispute that the Property was encumbered by a deed of trust, is less than two and one-half acres, and was

sold at a trustee's sale. The sole issue is whether the Property was limited to and utilized for a one-or two-family dwelling within the meaning of A.R.S. § 33–814(G).

■ ¶ 10 In looking at the plain language of the statute, we conclude the protection for "dwellings" under A.R.S. § 33–814(G) does not apply to vacant land. "Where the language of a statute is plain and unambiguous, courts must generally follow the text as written." *Mid Kansas Fed. Sav. & Loan Ass'n of Wichita v. Dynamic Dev. Corp.*, 167 Ariz. 122, 128, 804 P.2d 1310, 1316 (1991). To interpret the word "dwelling," we must give the word its ordinary meaning, "unless a specific definition is given or the context clearly indicates a special meaning was intended." *Mein ex rel. Mein v. Cook*, 219 Ariz. 96, 99 n. 2, ¶ 12, 193 P.3d 790, 793 n. 2 (App.2008). As recognized by our supreme court, "[t]he word 'dwelling' is susceptible to several interpretations, depending on the context of its use." *Mid Kansas*, 167 Ariz. at 128, 804 P.2d at 1316 (citation omitted). "However, the principal element in all such definitions is the 'purpose or use of a building for human abode,' meaning that the structure is wholly or partially occupied by persons lodging therein at night or *intended* for such use." *Id.* Similarly, this court has described a dwelling as "a shelter ... in which people live." *Indep. Mortg. Co. v. Alaburda*, 230 Ariz. 181, 183, ¶ 8, 281 P.3d 1049, 1051 (App. 2012). Given these definitions, it is clear that unimproved, vacant land cannot be properly characterized as a "dwelling." [2]

¶ 11 Here, it is undisputed that the Property is unimproved, vacant land. It was never used as a dwelling prior to the trustee's sale, and therefore was not utilized as a "dwelling" under § 33–814(G). *See PAM Transp. v. Freightliner Corp.*, 182 Ariz. 132, 133, 893 P.2d 1295, 1296 (1995) ("[I]f a statute specifies under what conditions it is effective, we can ordinarily infer that it excludes all others."). As a result, under the facts of this case the Rudgears' professed intent to

---

**2.** Unlike *Mueller*, which addressed a situation where construction of a dwelling had commenced on a lot, the Property here was vacant and there was no construction. *Mueller*, 228 Ariz. at 480, ¶ 11, 268 P.3d at 1137. We conclude, therefore, that *Mueller* is not applicable to the facts of this case. *See id.*

construct a home on the Property is irrelevant.

¶ 12 Accordingly, we conclude as a matter of law the Rudgears are not entitled to invoke the protection of A.R.S. § 33–814(G) because the Property consisted of vacant land and was not utilized as a dwelling. We therefore reverse the trial court's grant of partial summary judgment, and remand to the trial court for an entry of partial summary judgment in favor of BMO.

KESSLER, Judge, specially concurring.

¶ 13 I concur with the majority that when a trustee's sale occurs on a parcel of land on which no construction of a dwelling has begun, the prohibition of a deficiency judgment under Arizona Revised Statutes ("A.R.S.") section 33–814(G) (Supp.2013) does not apply. However, I write separately because the decision today leaves our superior courts in a quandary. If construction has begun, when does *M & I Marshall & Ilsley Bank v. Mueller*, 228 Ariz. 478, 268 P.3d 1135 (App. 2011), apply? Put another way, where should the courts draw the line between the lack of any construction and an almost completed dwelling to determine if the trustor is protected by § 33–814(G)? Should the debtor who cannot avoid default until shortly after a foundation is laid be excluded from anti-deficiency protection, but the debtor who defaults after the frame is up be entitled to protection? To avoid arbitrary line-drawing and comport with our prior cases and the policy behind the anti-deficiency statutes, I conclude that once any construction has begun, a court should determine whether the debtor is protected from a deficiency judgment based on a totality of the circumstances to see if the debtor intended the structure under construction to be utilized as his or her dwelling.

¶ 14 The anti-deficiency statutes do not expressly address whether a debtor's intent to use the structure as his or her dwelling controls application of the statute. Prior judicial opinions, in seeking to effectuate the legislature's purpose, have looked to a party's intent to utilize the structure, or partially-constructed structure, as his or her home. Thus, in *Mid Kansas Federal Savings and*

*Loan Association of Wichita v. Dynamic Development Corporation*, 167 Ariz. 122, 804 P.2d 1310 (1991), after determining that commercial residential developers are not excluded from anti-deficiency protection, *id.* at 129, 804 P.2d at 1317, the court held that "property is not utilized as a dwelling when it is unfinished, has never been lived in, and is being held for sale to its first occupant *by an owner who has no intent to ever occupy the property."* *Id.* (emphasis added).

¶ 15 In *Mueller*, this Court expanded on the intent analysis of *Mid Kansas*. The Muellers purchased a vacant lot and borrowed money from the bank to construct a single one-family home on the property for their own use. *Mueller*, 228 Ariz. at 479, ¶ 2, 268 P.3d at 1136. Before the home was complete, the Muellers abandoned construction and defaulted on the note. *Id.* at ¶ 3. The bank held a trustee's sale and sued to recover the deficiency. *Id.* at ¶ 4. The bank argued that the anti-deficiency statute did not apply because a home was never constructed on the property. *Id.* at ¶ 7. We disagreed, explaining that the result in *Mid Kansas* would have been the same even if the homes were finished because the debtor there intended to sell rather than occupy them. *Id.* at 480, ¶ 9, 268 P.3d at 1137. Unlike *Mid Kansas*, the Muellers intended to personally utilize the property as a dwelling upon completion and thus were entitled to protection from a deficiency judgment. *Id.*

¶ 16 *Mueller* is consistent with the statute's primary purpose of "protect[ing] certain homeowners from the financial disaster of losing their homes to foreclosure plus all their other nonexempt property on execution of a [deficiency] judgment." *Baker v. Gardner*, 160 Ariz. 98, 101, 770 P.2d 766, 769 (1988). As we explained in *Mueller*, a rule that defines utilization by present occupancy would undermine this purpose and lead to absurd results:

An individual facing the possibility of foreclosure may camp out in the unfinished home, claiming to be "utilizing" the dwelling. Additionally, a person who lived in a new home for a day would be entitled to anti-deficiency protection, whereas some-

one who had not yet moved into a newly constructed home would not be entitled to such protections. *Mueller,* 228 Ariz. at 480, ¶ 10, 268 P.3d at 1137.

¶ 17 *Mueller* instructs that present occupancy and the level of construction are not dispositive of whether property is intended to be utilized as the debtor's dwelling, at least when some construction has begun.[3] "[The] argument that a person has to physically inhabit the dwelling would create a blurry and artificial line." *Id.*

¶ 18 Similarly, a rule based on the level of construction that has already begun would require courts to "create ... blurry and artificial line[s]" based on whether foundation was laid, walls erected, or plumbing connected. Further, such an arbitrary rule would protect only those borrowers who managed to stay solvent long enough to achieve some yet undetermined level of construction, while leaving unprotected those whose economic misfortunes prevented them from doing more than breaking ground. Consequently, a borrower who takes any number of pre-construction steps toward building a dwelling the borrower intends to occupy, but who defaults just after putting shovel to dirt, would be left unprotected. Meanwhile, a borrower who takes all the same pre-construction steps but manages to stay solvent long enough to reach an undefined level of construction would receive anti-deficiency

protection. Such an outcome would undermine the purpose of § 33–814(G) and our reasoning in *Mueller.*

¶ 19 That does not mean that the level of construction is irrelevant to determining the borrower's intent. Rather, in determining a borrower's intent at the time the debt was incurred,[4] we should look to the totality of circumstances then and thereafter to determine if the borrower intended to occupy the planned building as a dwelling. Without limitation, long delays in signing contracts to build, the purchase of other lots in the same area to also build the borrower's alleged residence, and the stated intent in any loan documents all go to whether the borrower intends to build a dwelling in which to personally live. Thus, the level of construction alone is not determinative, but the type, manner, and extent of development are probative of the borrower's intent.

¶ 20 This conclusion is consistent with the stated public policy underlying the anti-deficiency statutes. As we recently noted in *Parkway Bank & Trust Co. v. Zivkovic:*

> The statutes were intended to "protect [ ] consumers from financial ruin" and "eliminat[e]"... hardships resulting to consumers who, when purchasing a home, fail to realize the extent to which they are subjecting assets besides the home to legal process." The anti-deficiency statutes "allocate the risk of inadequate security" to

3. Our legislature also appears to have rejected a present occupancy requirement when it repealed a short-lived amendment to A.R.S. § 33–814 that required the trustor/borrower to prove that he utilized the property as a dwelling for at least six consecutive months. *Compare* 2009 Ariz. Sess. Laws, ch. 68 (1st Reg.Sess.), *with* A.R.S. § 33–814(G). Furthermore, the introduced version of the bill that repealed the 2009 amendment had proposed a replacement provision that excluded "speculative construction project[s]" from anti-deficiency protection. S.B. 1004, 49th Leg., 4th Spec. Sess. (Ariz.2009) (introduced version). The proposed revision defined "speculative construction project" as "construction commenced with the intention of selling the trust property on completion to a third party" and stated that property "not occupied as a residence for four consecutive months immediately following completion is presumed to be a speculative construction project." *Id.* This proposed revision did not become law. *Compare id. with* A.R.S. § 33–814(G). Thus, our legislature twice rejected pro-

visions defining utilization in terms of present occupancy.

4. We should look to the borrower's intent at the time the loan is secured consistent with the underlying purpose of the anti-deficiency statutes. This protects consumers when they contract the debt for the property from subjecting their other assets to legal process and to protect them from financial ruin when contracting to incur the debt. *Parkway Bank & Trust Co. v. Zivkovic,* 232 Ariz. 286, 290, ¶ 16, 304 P.3d 1109, 1113 (App. 2013). Additionally, looking back at the time of incurring the debt is only fair to the lender, which should be able to assess the risk of whether it will be precluded from seeking a deficiency judgment in case of a default. *See Helvetica Servicing, Inc. v. Pasquan,* 229 Ariz. 493, 500, ¶ 30, 277 P.3d 198, 205 (App.2012) (noting that the anti-deficiency statutes allocate the risk of inadequate security to the lenders).

lenders, "thereby discouraging overvaluation of the collateral." Additionally, "[i]f inadequacy of the security results, not from overvaluing, but from a decline in property values during a general or local depression, [the anti-deficiency statutes] prevent the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability."

232 Ariz. 286, 290, ¶ 16, 304 P.3d 1109, 1113 (App.2013) (internal citations omitted).

¶ 21 Recognizing the fact that this case deals with vacant land, there are, nonetheless, some facts present here that are instructive in determining whether a borrower intends to use a dwelling as his or her house. *See Mueller*, 228 Ariz. at 479, ¶ 4, 480, ¶ 11, 268 P.3d at 1136, 1137 (applying anti-deficiency protections to the Muellers because they intended to build a dwelling on the property at the time that they acquired the loan, despite the fact that they admittedly abandoned that intent by the time of foreclosure). First, in the loan renewal documents the Rudgears listed the primary purpose of the Loan as "Business (including Real Estate Investment)" and the specific purpose as "RENEWAL—vacant land investment." (Emphasis in original.) Second, the Rudgears also purchased several contiguous lots and made plans to develop them simultaneously, undermining their purported intent on summary judgment that any building on this particular lot was to be their home because it suggests that they might have been engaged in speculative development rather than personal homebuilding. Third, the Rudgears' representations in other deeds of trust that they intended to utilize different parcels in the area as their residence undermines their purported intentions. Although § 33–814(G) does not require the borrower to use the property as a *primary* residence, *Indep. Mortg. Co. v. Alaburda*, 230 Ariz. 181, 184, ¶ 10, 281 P.3d 1049, 1052 (App.2012), the fact that the Rudgears represented that they simultaneously were going to utilize three different properties in the same area as their primary residence raises doubts about whether they truly intended to occupy *any* of these lots as their own residence. Ultimately, however, it is unnecessary for us to balance such factors in this case because no construction had begun on the Property.

¶ 22 Thus, I agree with the majority that given the language of § 33–814(G), the statute does not apply to a loan secured by property on which no construction has begun. However, once some development has begun, a court should look to the totality of the circumstances, and not an arbitrary level of construction, to determine if the debtor truly intended to use the property as his or her dwelling and be protected from deficiency judgments. This is consistent with *Mueller* and with the policy underlying the anti-deficiency statutes.