319 P.3d 1044

STATE of Hawai'i, Respondent/Plaintiff–Appellee,

v.

Nelson Kuualoha ARMITAGE, Petitioner/Defendant–Appellant. (ICA No. 29794; Case No. 2P106–02017).

State of Hawai'i, Respondent/Plaintiff–Appellee,

v.

Russell K. Kahookele, Petitioner/Defendant–Appellant. (ICA No. 29795; Case No. 2P106–02018).

State of Hawai'i, Respondent/Plaintiff–Appellee,

v.

Henry Maile Noa, Petitioner/Defendant–Appellant. (ICA No. 29796; Case No. 2P106–01909).

Nos. SCWC–29794, SCWC–29795, SCWC–29796.

Supreme Court of Hawai'i.

Jan. 28, 2014.

Daniel G. Hempey, for petitioners.

Renee Ishikawa Delizo (on the briefs), for respondent.

ACOBA, McKENNA, and POLLACK, JJ.; with RECKTENWALD, C.J., Concurring and Dissenting, with whom NAKAYAMA, J., joins.

## Opinion of the Court by ACOBA, J.

We hold that the complaints filed by the Respondent/ Plaintiff–Appellee State of Hawai'i (the State) against Petitioners/Defendants–Appellants Nelson Kuualoha Armitage (Armitage), Russel Kahookele (Kahookele), and Henry Maile Noa (Noa) (collectively, Petitioners) of the offense of Entrance into the Reserve (Kaho'olawe Reserve or the Reserve), Hawai'i Administrative Rule (HAR) § 13–261–10 (2002)[1] must be dismissed without prejudice because the charges failed to charge the requisite state of mind of intentionally, knowingly, or recklessly. *See State v. Apollonio*, 130 Hawai'i 353, 354, 311 P.3d

676, 677 (2013). Because of the likelihood of retrial, we discuss the questions raised in the September 16, 2013 application for writ of certiorari (Application) filed by Petitioners, and conclude (1) there was sufficient evidence adduced at trial to sustain Petitioners' conviction, (2) Petitioners did not "reasonably exercise[ ]" their constitutionally protected native Hawaiian rights, *see State v. Hanapi*, 89 Hawai'i 177, 184, 970 P.2d 485, 493 (1998), (3) because Petitioners were subject to penal liability pursuant to HAR § 13–261–10, they have "a claim of specific present objective harm", *City & Cnty. of Honolulu v. Ariyoshi*, 67 Haw. 412, 419, 689 P.2d 757, 765 (1984), and therefore have standing to challenge the constitutionality of that regulation, (4) Art. XII, section 7 of the Hawai'i Constitution does not create a separate right to nation-building, (5) Petitioners' purpose to claim and manage, control and subsequently occupy Kaho'olawe involved conduct outside the scope of any first amendment right to freedom of speech, (6) HAR §§ 13–261–10 or –11 does not abridge the constitutional right under the Hawai'i Constitution to engage in traditional and customary native Hawaiian practices, and (7) Petitioners' practice of religion was not substantially burdened by HAR §§ 13–261–10 and –11. Accordingly, we vacate the July 17, 2013 judgment of the Intermediate Court of Appeals (ICA) and the April 3, 2009 judgments of the District Court of the Second Circuit (the court)[2] and remand the case for disposition consistent with this opinion.

### I.

### A.

This case arises from three separate complaints filed by the State against Armitage,

---

1. HAR § 13–261–10 provides:

No person or vessel shall enter or attempt to enter into or remain within the reserve unless such person or vessel:
(a) Is specifically authorized to do so by the commission or its authorized representative as provided in section 13–261–11; or,
(b) Is specifically authorized to do so through a written agreement approved by the commission; or,
(c) Is trolling in zone B, in compliance with section 13–361–13(b)(3); or,
(d) Must enter the reserve to prevent probable loss of vessel or human life, provided that:

(1) Prior to entering the reserve and at reasonable intervals thereafter, such person shall make every reasonable effort to notify the commission staff or the United States Coast Guard that loss of vessel or human life is probable;
(2) All fishing gear shall be stowed immediately upon entering the reserve; and
(3) Such person shall vacate the reserve immediately after the threat of probable loss of vessel or human life has passed.
(Emphasis added.) HAR § 13–261–11 (2002) is set forth *infra* at n. 11.

2. The Honorable Simone C. Polak presided.

Kahookele, and Noa, alleging that, as noted, each defendant committed the offense of Entrance into the Reserve, HAR § 13–261–10. The complaint against Armitage and the complaint against Kahookele were filed on August 22, 2006, and the complaint against Noa was filed on August 28, 2006. The complaints stated as follows:

> The STATE OF HAWAIʻI, through the undersigned, its Deputy Prosecuting Attorney, hereby accuses and charges the Defendant as follows:

> That on or about the 31st day of July, 2006, in the Division of Wailuku, County of Maui, State of Hawaii, [the defendant] did enter or attempt to enter into, or remain within the Kahoʻolawe Island Reserve without being specifically authorized to do so by the commission or its authorized representative, thereby committing the offense of Entrance Into the Reserve, in violation of Section 13–261–10 of the [HAR], Department of Land and Natural Resources.

Petitioners all pled not guilty to the offense.

On October 18, 2006, Petitioners filed a Motion to Consolidate their cases pursuant to Hawaiʻi Rules of Penal Procedure (HRPP) Rule 13 (2006)[3]. In the Motion to Consolidate, Petitioners noted that the only difference in factual circumstances among Petitioners was that Noa was on a boat on the waters of the Kahoʻolawe Reserve, while Armitage and Kahookele were on land in the Reserve. The court held a hearing on the Motion to Consolidate on October 26, 2006 and granted the Motion to Consolidate.

**3.** HRPP Rule 13 provides, in relevant part:

> (a) Generally. The court may order consolidation of two or more charges for trial if the offenses, and the defendants if there are more than one, could have been joined in a single charge.

**4.** HRPP Rule 12 provides, in relevant part:

> (b) Pretrial motions. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by Motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial;
> (1) defenses and objections based on defects in the institution of the prosecution;
> (2) defenses and objections based on defects in the charge (other than that it fails to show

**B.**

On January 9, 2007, Petitioners filed a Motion to Dismiss pursuant to HRPP Rule 12 (2006)[4]. In their Memorandum in Support of the Motion to Dismiss, Petitioners appeared to challenge the court's jurisdiction, offer defenses to the charge, and bring a constitutional challenge to the validity of HAR § 13–261–10. Among these arguments, Petitioners asked the court to recognize their Restored Hawaiian Government (also referred to as the Reinstated Kingdom of Hawaiʻi or Reinstated Nation of Hawaiʻi) as "the sovereign Native Hawaiian entity" pursuant to Hawaiʻi Revised Statutes (HRS) § 6K–9 (1993)[5]. Petitioners argued, *inter alia*, that the charges should be dismissed because Petitioners could prove the defense of privilege under *Public Access Shoreline Hawaiʻi v. Hawaiʻi County Planning Commission ("PASH")*, 79 Hawaiʻi 425, 903 P.2d 1246 (1995), and *Hanapi*, and that the regulations were unconstitutional. As an attachment to the Motion to Dismiss, Petitioners included a Declaration of Noa, which stated that he is the "democratically elected Prime Minister of the Reinstated Hawaiian Nation" and concluded as follows: "[i]n sum, the Kingdom of Hawaii/Government has re-emerged with a working, sovereign government and demands the return of all Kingdom assets and the State of Hawaiʻi immediately return the island of Kahoolawe to the Kingdom of Hawaii/Government."

In its Memorandum in Opposition to the Motion to Dismiss, filed on July 17, 2007, the

> jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings)[.]

**5.** HRS § 6K–9 provides:

> Upon its return to the State, the resources and waters of Kahoʻolawe shall be held in trust as part of the public land trust; provided that the State shall transfer management and control of the island and its waters to the sovereign native Hawaiian entity <u>upon its recognition by the United States and the State of Hawaiʻi</u>. All terms, conditions, agreements, and laws affecting the island, including any ongoing obligations relating to the clean-up of the island and its waters, shall remain in effect unless expressly terminated.

State argued, *inter alia,* that the court had jurisdiction, Petitioners admitted the violation, the relevant administrative rules and statutes were constitutional, and that the court was not the proper forum to recognize the Reinstated Kingdom of Hawai'i as a sovereign nation.

Petitioners filed a reply on July 26, 2007, asserting what they termed the "Lorenzo defense" based on the ICA's decision in *State v. Lorenzo,* 77 Hawai'i 219, 883 P.2d 641 (App.1994), that future courts would consider evidence and arguments in support of recognition of the inherent sovereignty of native Hawaiians. Petitioners also maintained that they are citizens of a nation rather than a group and that "[t]he fact that there are other 'groups' out there, or that the State is trying to create its own domestic dependent nation (as opposed to a true—sovereign nation—the type of nation for which Kahoolawe is held in trust) is not relevant to [the Lorenzo] defense."

The court held evidentiary hearings on the Motion to Dismiss. On July 27, 2007, John Gates (Gates) testified for Petitioners as an expert in the areas of self-determination of indigenous people and international law. The hearing was continued to January 25, 2008. Petitioner Noa testified on his own behalf regarding his status as "Prime Minister of the Reinstated Hawaiian Government" and about the underlying incident, which he stated was undertaken to pursue the reinstatement of the Kingdom of Hawai'i.

The next hearing took place on April 4, 2008. At the outset, the court indicated that the parties would give a brief oral summary of what they believed the evidence had shown and provided that the parties were in agreement, they would submit written arguments as well as proposed findings of fact and conclusions of law. The court would then make its decision and if necessary, advise the parties of the trial date and set a pretrial at which further issues could be addressed. Then, Petitioner Noa continued his testimony and was cross-examined by the State.

Petitioners' attorney indicated that Petitioners "would treat this hearing as if Mr. [Armitage] and Mr. Kahookele also testified, and with the exception of their position within their elected government[6], their testimony would mirror that of Mr. Noa." The State agreed. Petitioner's attorney also stated his clients were prepared to waive any conflict as to counsel.

The court engaged in a colloquy with Noa, Armitage and Kahookele, and all three Petitioners agreed to waive any conflict in representation. At the request of the court, each party then summarized its arguments on the record.

The parties each submitted proposed findings of fact and conclusions of law with respect to the Motion to Dismiss. On October 9, 2008, the court issued its "Findings of Fact [ (findings) ], Conclusion of Law [ (conclusions) ] and Order Denying Defendants' Motion to Dismiss." The relevant findings follow: [7]

1. On or about July 31, 2006, [ ] Armitage, Kahookele, and Noa <u>traveled to Kaho'olawe</u> as elected representatives and citizens of the Reinstated Kingdom of Hawai'i for purposes <u>of exercising and proclaiming the Reinstated Kingdom's property rights in the Kaho'olawe Island Reserve and its adjacent waters, to build an ahu[8], and to offer prayer on the island.</u>

 . . . .

8. [ ] Armitage and Kahookele intentionally chose to ignore and disregard the written application process and <u>made no attempt to comply with the established procedures to seek authorization to visit Kaho'olawe.</u>

 . . . .

(Emphasis added.)

6. For example, Noa testified that he was "Prime Minister of the Reinstated Hawaiian Government," while Armitage and Kahookele apparently held different positions in the Reinstated Hawaiian Government.

7. Many of the findings of fact entered by the court on the Motion to Dismiss were repeated in the March 10, 2009 Stipulation as to Evidence, which is reproduced in full *infra.*

8. "Ahu" can be defined as altar or shrine. Samuel H. Elbert, *Hawaiian Dictionary* 8 (1986).

10. [ ] Noa had knowledge that the Reserve had served as a bombing range for approximately fifty years. [ ]

11. [Petitioners] assert that the State's "compelling interest in restricting access to Kaho'olawe is to protect citizens from dangers that may still exist on the island from military activity. [Petitioners] do not challenge this as a compelling interest-to do so would be unreasonable."

12. [Petitioners] traveled to the Reserve to claim Kaho'olawe and to manage and control the island.

. . . .

14. Notwithstanding [Petitioners'] expert testimony, and even assuming the general accuracy of the expert's opinion, Defendants have failed to prove that the Reinstated Nation of Hawai'i is a sovereign native Hawaiian entity and the [c]ourt lacks authority to make such a determination.

15. To date, no sovereign native Hawaiian entity has been recognized by the United States and the State of Hawai'i; however, there are several native Hawaiian organizations, in addition to [Petitioners], seeking this recognition.

16. [Petitioners] request this court recognize the reinstated Nation of Hawai'i as the sovereign native Hawaiian entity and to "provide guidance as to exactly what need[s] to be done to achieve Hawaii's elusive promise of recognition to the re-emerged Hawaiian nation that was illegally overthrown in 1893."

17. [Petitioners] ask this [c]ourt to provide them with standards or guidelines to resolve their attempt to be recognized by the State and Federal governments as the native Hawaiian sovereign entity.

18. Upon landing on Kaho'olawe [Petitioners] undertook a traditional ceremony. "In our traditional practice, in our culture, it is well understood that when you have an event, be it a small event, or large event, you always pay respect to your ancestors, to your various Gods that our religion has or just to Akua itself".

19. The State elicited testimony that the Island of Kaho'olawe may be unsafe, due to unexploded [ordnance [9]] on the island. [Petitioners] claimed that the administrative regulations were not narrowly tailored to meet that State interest.

20. [Petitioner] Noa, and his expert each testified that Native Hawaiians traditionally and customarily managed and controlled the island of Kaho'olawe prior to 1893. [ ]

21. [Petitioners] are Native Hawaiian, within the meaning set forth in Hawai'i state law.

22. The land on Kaho'olawe is undeveloped.

(Emphases added.)

The court's conclusions of law stated, in relevant part:

1. HAR § 13–261–3 [ (2002) ] defines the boundary of the Reserve as "the entire island of Kaho'olawe and those waters and submerged lands seaward of the shoreline of Kaho'olawe island to a distance of approximately two miles".

. . . .

4. [Petitioners] did not submit a written application to the KIRC; therefore, [Petitioners] violated § 13–261–10 by failing to obtain the requisite authorization to enter into or conduct an activity in the Reserve.

5. HAR §§ 13–261–10 or 13–261–11 [ (2002) [10] ] are presumptively constitution-

___

9. "Ordnance" is defined as military supplies, including weapons and ammunition. *See Merriam–Webster's Collegiate Dictionary* 819 (10th ed. 1993).

10. HAR § 13–261–11 sets forth the "Procedure for the authorization of entrance into and activity within the reserve[,]" in relevant part as follows:

(a) Any person required by this chapter to obtain commission authorization to enter into or conduct activity within the reserve shall apply for such authorization by making written application to the commission. The forms for such application may be obtained from the commission office. The application shall include:

(1) The applicant's name, address and telephone number;

(2) The dates and locations of the requested entrance;

(3) A description of the purposes of and activities associated with the entrance;

(4) The number and names of persons who will participate in the requested entrance; and

**44**

al; [Petitioners] have made no showing that either HAR §§ 13–261–10 or 13–261–11 have clear, manifest, and unmistakable constitutional defects, and they certainly have failed to prove that the rules are unconstitutional beyond a reasonable doubt. *SHOPO v. Soc. of Prof. Journalists*, 83 Hawai'i 378, 289 [389], 927 P.2d 386, 397 (1996).

6. Article XII, section 7 of the Hawai'i Constitution provides: The State reaffirms and protects all rights, customarily and traditionally exercised for subsistence, cultural, and religious purposes, and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights. (Emphasis added.)

7. Native Hawaiians have the right to enter undeveloped lands owned by others to practice continuously exercised access and gathering rights necessary for subsistence, cultural or religious purposes, so long as no actual harm was done by the practice, and "the retention of Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area." *Kalipi v. Hawaiian Trust Co., Ltd.*, 66 Haw. 1 at 10, 656 P.2d 745 (1982).

8. "It is the obligation of the person claiming the exercise of a native Hawaiian right to demonstrate that the right is protected." [ ] *Hanapi*, 89 Hawai'i at 184, 970 P.2d [at 492] [ ].

9. To establish the existence of a traditional or customary native Hawaiian practice, "there must be an adequate foundation in the record connecting the claimed right to a firmly rooted traditional or customary native Hawaiian practice." Such foundation includes any explanation of the history or origin of the claimed right, description of the ceremonies involved, or specialized knowledge through expert testimony that the claimed right is a traditional or customary native Hawaiian practice. *Id.* at 187 [970 P.2d at 495].

10. The State is only obligated to "protect the reasonable exercise of customarily and traditionally exercised right of Hawaiians to the extent feasible;" "unreasonable or non-traditional uses are not permitted." [*PASH* ], 79 Hawai'i at 450, 903 P.2d [at 1271] [ ].

11. The application process set forth in HAR § 13–261–11(b) follows the requirements made by the [c]ourt in *Hanapi* and includes a process by which an applicant to the Reserve, through consultation with cultural practitioners, can establish the existence of [ ] traditional or customary native Hawaiian practices.

12. The Historical Note section of HAR § 13–261 states, "In recognition of the substantial amount of unexploded ordnance and hazardous materials present on the island and in the adjacent waters, institutional controls are required because of the imminent threat to public health and safety which will continue to exist until the Kaho'olawe island reserve has been cleared of unexploded ordnance and hazardous waste." (Emphasis added.)

13. The process defined in HAR § 13–261–11, does not prohibit people from accessing the Reserve to exercise native Hawaiian traditional and customary rights; rather, it enables the KIRC, who has a compelling interest to protect the health and safety of all those who access the Reserve, to determine if the exercise of those rights is feasible and whether it can

(5) A safety and logistics plan addressing transportation to and from the island, and safety protocols while in the reserve.
(6) A signed liability release waiver acknowledging and accepting full risk and responsibility for exposure to all natural and man-made hazards within the reserve including the potential presence of and contact with unexploded ordnance and other hazardous debris.

(7) Information pertinent to the basis of the applicant's claim to exercise traditional and customary rights if such rights are claimed.
(b) Entrance into and activities within the reserve requested by applicants seeking to exercise traditional and customary rights and practices compatible with the law, shall be approved or disapproved by the commission after review and consultation with cultural practitioners.
(Emphases added.)

be done in [a] manner that ensures the safety of the practitioners.

14. [Petitioners'] purpose to claim and manage control and subsequently occupy Kaho'olawe involved conduct outside the scope of any first amendment right to freedom of speech. *State v. Jim,* 105 Haw[ai'i] 319, 97 P.3d 295 [395] (2004)[ () citing *Procunier v. Martinez,* 416 U.S. 396, 411–12 [94 S.Ct. 1800, 40˙L.Ed.2d 224] (1974).[) ]

15. The government may impose reasonable restrictions on the time, place, or manner of engaging in protected speech provided that they are adequately justified without reference to the content of the regulated speech. *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 428 [113 S.Ct. 1505, 123 L.Ed.2d 99] (1993).

16. The application process set forth in HAR § 13–261–11 is clearly content-neutral, as the rule only sets time, place, or manner restrictions on the access applicants, without any burdens on speech.

17. [Petitioners] cannot argue that the procedure set forth in HAR § 13–261–11 prohibited them from exercising their First Amendment rights, if they never attempted to employ the application and approval process.

18. The procedural requirements in HAR § 13–261–11 are content-neutral, only impose time, place, and manner restrictions, and apply equally to all who wish to access the Reserve in order to ensure the health and safety of the public, and to prevent uses that are dangerous, unlawful, or impermissible under HRS [Chapter] 6K.

19. [Petitioners] did not prove their deprivation of the right to free exercise of religion, because their testimony and evidence failed to establish "that such practice is an integral part of a religious faith and the prohibition … results in a virtual inhibition of the religion or the practice of the faith." [ ] *State v. Blake,* 5 Haw.App. 411, 413[, 695 P.2d 336, 338] (1982) [ (1985) ] [ (quoting] *People v. Mullins,* 50 Cal.App. [Cal.App.3d] 61, 70, 123 Cal.Rptr. 201, 207 (1975)[) ] [ (emphasis in original) ].

. . . .

22. The Apology Resolution [Pub.L.No. 103–150, 107 Stat. 1510, 1510 (1993) ] and related State legislation, including HRS Chapter 6K "gave rise to the State's fiduciary duty to preserve the corpus of the public land trust, specifically ceded lands, until such time as the unrelinquished claims of the native Hawaiians have been resolved." *Office of Hawaiian Affairs v. HCDCH,* 117 Hawai'i 174, 177 P.3d 884 (2008).

23. The "Apology Resolution acknowledges only that unrelinquished claims (by Native Hawaiians) exist and plainly contemplates future reconciliation with the United States and the state with regard to those claims." *Id.*

24. The [s]upreme [c]ourt [of the Territory of Hawai'i] in *Territory v. Kapiolani Estate,* refused to recognize a claim disputing the Territory's title to ceded lands, and held:

> The validity of the declaration in the constitution of the Republic of Hawai'i, under which the present title is derived, does not present a judicial question. Even assuming, but in no way admitting, that the constitutional declaration was confiscatory in nature, this court has no authority to declare it invalid. The subsequent derivation of the title by the untied States is clear. The position here taken in refusing to regard the defendant's claim that title is otherwise than is fixed by constitutional law as presenting a judicial question is well illustrated in numerous decisions of the United States Supreme Court.

18 Haw. 640, [ ] 645–46 (1908) [ (emphasis added) ].

25. Even assuming, but in no way admitting that the constitutional declaration was confiscatory in nature, the court had no authority to declare it invalid. *Id.*

26. In *Territory v. Puahi,* the [supreme] [c]ourt [of the Territory of Hawai'i] refused to consider a challenge to the Territory's title stating, "[A] judicial question is not presented by a claim requiring a ruling that Art. 95 of the constitution of the Republic of Hawai'i is unconstitutional." 18 Haw. 649, 651 (1908).

27. Congress stated that nothing in the Apology Resolution would "serve as a settlement of claims against the United States." (Apology Resolution, section 3 [at 1514]).

28. The Senate Report accompanying the Apology Resolution explains that its enactment "will not result in any changes in existing law." S.Rep.No. 103–26, at 35, Ex. M. (1993).

29. While the United States expressed its deep regret to the Native Hawaiian people for the federal government's participation in the overthrow of the Kingdom of Hawai'i, and pledged to support reconciliation efforts, the Apology resolution did not create any substantive rights. *See also* [,] *Rice v. Cayetano,* 941 F.Supp. 1529, 1546 [ ]n. 24 (D.Hawai'i 1996), *rev'd on other grounds* [by] 528 U.S. 495 [120 S.Ct. 1044, 145 L.Ed.2d 1007] (2000).

30. An action by this [c]ourt would, in turn, direct Congress and the State Legislature to recognize the Reinstated Nation of Hawai'i as the native Hawaiian sovereign entity, and this [c]ourt cannot act where Congress and the State Legislature must.

31. "In sum, all of the aforementioned pronouncements indicate that the issue of native Hawaiian title to the ceded land will be addressed through the political process." *OHA v. HCDCH,* [ ] 117 Hawai'i at [213, 177 P.3d at] 923.

. . . .

33. " 'International law' takes precedence over state statutes in only limited circumstances. These circumstances are not present when the dispute is concerned with domestic rights and duties." *State v. Marley,* 54 Haw. 450, 467–68, 508 [509] P.2d 1095, 1107 (1973).

34. The State of Hawai'i has a legitimate interest in the conduct of persons within its jurisdiction, and their conduct is amenable to reasonable state regulation, regardless of "international law." *[Id.]* at 468–69 [, 509 P.2d at 1107] [ (] citing *Skiriotes v. State of Florida,* 313 U.S. 69 [61 S.Ct. 924, 85 L.Ed. 1193] (1941)[) ].

35. "It is the law in this jurisdiction that a proceeding against property in which the State of Hawai'i has an interest is a suit against the State and cannot be maintained without the consent of the State," so that the State "and its interest in the land [are] immune from suit." *A.C. Chock, Ltd. v. Kaneshiro,* 51 Haw. 87, 88, 451 P.2d 809, 811 (1969).

36. "If it be made to appear at any stage of the case that the State claims title, the court's jurisdiction over the merits of such claims thereby is ousted under the doctrine of sovereign immunity." *Marks v. Ah Nee,* 48 Haw. 92, 94, 395 P.2d 620, 622 (1964).

(Emphases added.)

## C.

On March 10, 2009, the parties entered a Stipulation as to Evidence, stating as follows:

1. On or about July 31, 2006, [Petitioners] [Armitage], [Kahookele], and [Noa] entered the Kaho'olawe island reserve ("Reserve") in the County of Maui, State of Hawai'i.

2. [HAR § ] 13–261–3 defines the boundary of the Reserve as "the entire island of Kaho'olawe and those waters and submerged lands seaward of the shoreline of Kaho'olawe island to a distance of approximately two miles."

3. [Petitioners] Armitage, Kahookele, and Noa entered the waters of the Reserve and landed on the island of Kaho'olawe in the area of Hakioawa.

4. [Petitioner] Noa was cited by the Department of Land and Natural Resources (DLNR) Division of Conservation and Resources Enforcement (DOCARE) Officer Kapahuleha for Prohibited Entry into the Kaho'olawe Island Reserve in violation of HAR [§ ] 13–251–10.

5. [Petitioners] Armitage and Kahookele were placed under arrest by DLNR DOCARE Officers for Prohibited Entrance into the Kaho'olawe Island Reserve in violation of HAR [§ ] 13–261–10.

6. HAR [§ ] 13–261–10, reads in relevant part: "No person or vessel shall enter or attempt to enter into or remain within the reserve unless such person or vessel: (a) Is specifically authorized to do so by the

commission or its authorized representative as provided in section 13–361–11; or (b) Is specifically authorized to do so through a written agreement approved by the commission; or (c) Is trolling in zone B, in compliance with section 13–261–13(b)(3); or (d) Must enter the reserve to prevent probable loss of vessel or human life."

7. [Petitioners] were not specifically authorized by the commission or its authorized representative to enter into or remain within the Reserve as provided in section 13–261–11, which reads in relevant part: "Procedure for the authorization of entrance into and activity within the reserve. (a) Any person required by this chapter to obtain commission authorization to enter into or conduct activity within the reserve shall apply for such authorization by making written application to the commission."

8. [Petitioners] did not make a written application to the commission for the authorization of entrance into and activity within the Reserve.

9. [Petitioners] were not specifically authorized to enter into or remain in the Reserve through a written agreement approved by the commission.

10. [Petitioners] were not trolling in zone B, the waters of the Reserve that are deeper than thirty fathoms in depth, and the submerged lands beneath such waters from the point where the thirty fathoms begins and proceeding out to the boundary of the Reserve.

11. [Petitioners] did not enter the Reserve to prevent probable loss of vessel or human life.

. . . .

21. The State and [Petitioners] agree and stipulate, that all testimony, including expert testimony that was presented during the hearing on the Motion to Dismiss is fully incorporated into the trial on this matter, and such testimony shall be considered to have been taken at trial.

22. The State and [Petitioners] agree and stipulate, that all exhibits that were admitted into evidence during the hearing on [Petitioners'] Motion to Dismiss are also admitted, without objection, into evidence at trial.

23. The State and [Petitioners] request that the [c]ourt take judicial notice of all filings in [Petitioners'] case.

(Emphases added.) The Stipulation was signed by each Petitioner,

On April 3, 2010, the court held a stipulated facts trial. At the outset of the trial, the court stated as follows with respect to the acceptance of the stipulation:

The stipulation itself does not contain an acknowledgment of the rights that the defendants would be giving up by the [c]ourt accepting the stipulation, so the [c]ourt wants to be assured that all defendants knowingly, willingly, and voluntarily agree that the stipulation, which has been signed, should be considered by the [c]ourt. Therefore, the [c]ourt is going to do an advisement on the record, and it will be— what I'll do is I'll state what your rights are, and then after each one I'll ask you. And I think we have done this the last time, so I think you folks know how this works.

So, first of all, I do want to advise you that you have a right to have a trial in this matter. We are set for trial today. And, as I indicated, the stipulation appears to sort of alleviate the necessity of a trial. So I want to be sure that you understand, first, you have a right to have a trial in this matter. Can I get an agreement from each of the defendants?

Each Petitioner then stated his name and assented, and the court proceeded to ask Petitioners, first, "do you understand that at trial it would be the Government's burden to prove each of the elements of the charged offense beyond a reasonable doubt?", to which each Petitioner replied "Yes". Second, the court related that the stipulation appeared to cover all of the essential elements of the offense charged, and asked Petitioners if "each one of you is willing to stipulate, in other words, to agree, that these facts that are set forth as stipulations, that the Court shall accept those inclusively without any further witness testifying." Each Petitioner independently indicated their assent. Third, the court asked the Petitioners to "indicate

for the record that you, in fact, have signed the stipulation as to evidence." Again, Petitioners each indicated assent.[11]

█ The court then engaged in a *Tachibana* colloquy with Petitioners. *See Tachibana v. State*, 79 Hawai'i 226, 900 P.2d 1293 (1995).[12] The court noted that Noa had testified at the earlier hearing, stated that it did not think it needed to redo the waiver, but wanted to address that issue out of an abundance of caution.

The State argued that all the elements of the offense were proven against each Petitioner beyond a reasonable doubt. In response, defense counsel maintained that Petitioners were not guilty because they acted as nationals of a sovereign government, a defense which the State had not disproved beyond a reasonable doubt. In rebuttal, the State answered that the defense did not raise a reasonable doubt as to Petitioners' guilt.

The court found that "the State has proven its case beyond a reasonable doubt ... that [Petitioners] ha[d] violated HAR [§ ] 13–261–10 by entering the Reserve area without specific authorization by [the Kaho'olawe Island Reserve Commission (KIRC or the commission) ], and without having had any of the other reasons ... which would also be an exception." The court further noted that it disbelieved Gates' testimony and rejected the sovereign nation defense. Petitioners were found guilty and the court sentenced each

Petitioner, but stayed execution of the sentences pending appeal.

## II.

On April 21, 2009, Petitioners filed a Notice of Appeal with the ICA. In their Opening Brief, they set forth a number of arguments, two of which are relevant to the instant Application.[13] They asserted, *inter alia*, that "the court applied the wrong standard when it rejected [Petitioners'] defense that the regulations they are alleged to have violated are unconstitutional as a prior restraint on Native Hawaiian rights" and that "the court was in error when it rejected [Petitioners'] defense of privilege under *Pash* and *Hanapi*."

## III.

As noted, the ICA issued its SDO on April 30, 2013.[14] *State v. Armitage*, 129 Hawai'i 425, 301 P.3d 1266, 2013 WL 1829663, at *1 (App. April 30, 2013). In response to Petitioners' apparent defense that they were engaging in establishment of a sovereign native Hawaiian government, the ICA concluded that this court's recent decision in *State v. Kaulia*, 128 Hawai'i 479, 291 P.3d 377 (2013), resolved the issue. *Id.* at *2. The ICA noted that, analogous to *Kaulia*, "[Petitioners] contend the 'legitimacy' of the Reinstated Nation of Hawai'i as the sovereign native Hawaiian entity renders them 'exempt from the application of the State's laws." *Id.* According to

---

**11.** In *State v. Murray*, 116 Hawai'i 3, 10, 169 P.3d 955, 962 (2007), this court held that "[t]he defendant's right to have each element of an offense proven beyond a reasonable doubt is a constitutionally and statutorily[ ] protected right[,]" and accordingly, a stipulation waiving proof of an element of the charge must be made knowingly and voluntarily. In light of this on-the-record colloquy, this case is distinguishable from *State v. Pratt*, 127 Hawai'i 206, 277 P.3d 300 (2012), where "the record [was] silent as to whether [the defendant] understood he had [ ] a right [to have the prosecution establish each element of the charged offense beyond a reasonable doubt] or that [the defendant] waived [that] right." 127 Hawai'i at 225, 277 P.3d at 319 (Acoba, J., dissenting).

**12.** The *Tachibana* colloquy is an "oral exchange ... in which [the court] ascertains the defendant's understanding of the proceedings and of the defendant's rights." *State v. Chong Hung Han*, 130 Hawai'i 83, 90, 306 P.3d 128, 136

(2013) (emphases omitted) (internal quotation marks and citation omitted). The *Tachibana* colloquy is designed to ensure that the defendant is aware of his or her right to testify and that he or she knowingly and voluntarily waived that right. *Tachibana*, 79 Hawai'i at 237, 900 P.2d at 1304.

**13.** In addition, Petitioners argued that (1) "the court committed plain error when it determined it was incompetent to make a determination of sovereignty and when it thus declined to recognize [Petitioners'] nations's inherent sovereignty"; and (2) the court "engaged in improper burden shifting and committed reversible error when it failed to require the prosecution as part of its burden of persuasion to prove beyond a reasonable doubt the facts negating [Petitioners'] non-affirmative defenses."

**14.** The ICA's SDO was issued by Chief Judge Craig H. Nakamura, Judge Alexa D.M. Fujise, and Judge Katherine G. Leonard.

the ICA, individuals claiming to be citizens of an independent sovereign entity are not exempt from the state's laws, and therefore the district court did not err in rejecting Petitioner's defense based on their sovereignty claims.

The ICA also concluded that Petitioners' conduct was not protected by the privilege for customary and traditional native Hawaiian practices under article XII, section 7 of the Hawai'i Constitution. *Id.* at *3. Applying the balancing test in *Pratt*, the ICA explained that, the regulations restricting access to the Reserve are necessary to protect health and safety, and that persons seeking access to the Reserve in order to exercise traditional and customary native Hawaiian rights and practices may apply with the commission for approval. *Id.* (citing HAR § 13–261–11). In this case, Petitioners had not attempted to use the regulatory process, and under these circumstances the ICA determined that the State was entitled to prosecute Petitioners. *Id.*

Finally, the ICA reasoned that the regulations at issue were constitutional, because they were supported by a compelling State interest in protecting the public's health and safety, and included consideration of requests based on the exercise of traditional and customary rights and practices. *Id.* at *4. The ICA therefore upheld the court's judgments against Petitioners.

### IV.

Petitioners filed their amended Application with this court on September 16, 2013, asking whether (1) "HAR § 13–261–11 is ... unconstitutional as a prior restraint on traditional and customary Native Hawaiian rights and religious rights" and "whether the regulations were narrowly drawn" even if a compelling state interest were involved; and (2) whether the ICA erred "in failing to analyze [HAR] § 13–261–11 in light of fundamental rights, instead deciding this case based on subject matter jurisdiction[.]" The State did not file a Response.

### V.

The sufficiency of the complaints is not raised by either party.[15] However, the complaint failed to adequately allege that Petitioners violated HAR § 13–261–10 intentionally, knowingly, or recklessly. Therefore, the complaint must be dismissed without prejudice. *See Apollonio,* 130 Hawai'i at 359, 311 P.3d at 682; *see also State v. Gonzalez,* 128 Hawai'i 314, 324, 288 P.3d 788, 798 (2012); *State v. Nesmith,* 127 Hawai'i 48, 51, 276 P.3d 617, 620 (2012).

### A.

The complaints [16] charged Petitioners with violating HAR § 13–261–10. To reiterate, HAR § 13–261–10 provides that "[n]o person or vessel shall enter or attempt to enter into or remain within the reserve unless such person or vessel" is authorized to do so, or the person or vessel meets one of the other exceptions.[17] HAR § 13–261–10 does not

---

15. Upon this court's acceptance of certiorari, the parties were asked to provide supplemental briefing on whether the complaints must be dismissed without prejudice under *Apollonio,* 130 Hawai'i at 359, 311 P.3d at 682, because they did not allege the state of mind required to commit the offense of Entrance into the Reserve, HAR § 13–261–10.

The State's Supplemental Brief first conceded that the complaints did fail to set forth the requisite state of mind for the offense. The State also conceded that the complaints were deficient because they failed to state "which 'reserve' " Petitioners entered, "which commission" was involved, or set forth the appropriate state of mind for an attempt offense. Based on the disposition set forth herein, we need not address these additional matters.

Petitioners' Supplemental Brief also argues that the complaints failed to charge the requisite state of mind, that therefore, the charges failed to state an offense and thus must be dismissed with prejudice. Petitioners further allege, as discussed *infra,* that the charges should be dismissed with prejudice because any new charges would be time-barred by the statute of limitations.

16. To reiterate, the State filed individual complaints against Armitage, Kahookele, and Noa. Each complaint set forth identical allegations for the purposes of the discussion *infra.*

17. As stated previously, HAR § 13–261–10 also provides exceptions for persons or vessels who are "trolling in zone B, in compliance with section 13–361–13(b)(3)," and persons or vessels who "[m]ust enter the reserve to prevent probable loss of vessel or human life[.]"

specify the state of mind required to establish entry into the reserve. Under the Hawai'i Penal Code, when a penal law does not specify the relevant state of mind, "that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly," HRS § 702–204 [18], unless the offense is either a violation or an absolute liability offense. HRS § 702–212.[19]

■ First, HAR § 13–261–10 is not a violation. Pursuant to HRS § 701–107(5) an offense "constitutes a violation if it is so designated in … the law defining the offense or if no other sentence than a fine, or fine and forfeiture or other civil penalty, is authorized upon conviction…." However, HRS § 6K–8 provides that "[a]ny person who violates any of the laws or rules applicable to the island reserve," including HAR § 13–261–10, "shall be fined not more that $1,000 or imprisoned not more than 30 days, or both[.]" (Emphasis added.) Additionally, HAR § 13–261–10 is not specifically designated as a violation.

■ Moreover, a legislative purpose to impose absolute liability does not "plainly appear" from either the legislative history of HAR § 13–261–10. The commentary to HRS § 702–212 "counsels that strict liability 'should not be discerned lightly by the courts,' that HRS § 702–212(2) 'severely limits the situations which will allow the imposition of absolute criminal liability,' and that

'strict liability in the penal law is indefensible in principle if conviction results in the possibility of imprisonment.'" *Gonzalez*, 128 Hawai'i at 322, 288 P.3d at 796 (quoting Commentary to HRS § 702–212.). Conviction of HAR § 13–261–10 results in "the possibility of imprisonment," and therefore the imposition of strict liability is "indefensible in principle." *Id.*

Further, a legislative intent to impose strict liability does not "plainly appear" from the relevant legislative history. The KIRC's authority to enact HAR § 13–261–10 is derived from HRS § 6K–6. The penalties for violations of HAR § 13–261–10 are imposed by HRS § 6K–8. Nothing in the legislative history of either demonstrates that the legislature intended to allow the KIRC to enact absolute liability offenses. Hence, HAR § 13–261–10 does not impose absolute liability.

**B.**

■ Because none of the exceptions in HRS § 702–212 apply, under HRS § 702–204, the State was required to prove that individuals who violated HAR § 13–261–10 did so intentionally, knowingly, or recklessly. The complaints, however, did not specify that Petitioners act intentionally, knowingly, or recklessly. Therefore, the complaints did not allege the requisite state of mind.[20]

---

**18.** HRS § 702–204 provides in relevant part as follows:

> Except as provided in section 702–212, a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense. <u>When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly.</u>
> (Emphases added.)

**19.** HRS § 702–212 provides in relevant part as follows

> <u>The state of mind requirements prescribed by sections 702–204 and 702–207 through 702–211 do not apply to:</u>
> (1) <u>An offense which constitutes a violation,</u> unless the state of mind requirement involved is included in the definition of the violation or a legislative purpose to impose such a requirement plainly appears; or

> (2) <u>A crime defined by statute other than this Code, insofar as a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears.</u>
> (Emphases added.)

**20.** In its supplemental brief, the State concedes that the complaints were defective because they did not allege the requisite state of mind with respect to attempt. As recounted by the State, the complaints alleged that Petitioners "did enter or <u>attempt</u> to enter into" the reserve. (Emphasis added.) However, to demonstrate that a defendant is guilty of attempt, the State must demonstrate that, *inter alia*, the defendant "<u>intentionally</u> engag[ed] in conduct which … constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime." HRS § 705–500(1)(b) (1993) (emphasis added). Because the complaints did not allege that Petitioners acted intentionally, the complaints did not allege the required state of mind with respect to attempt. However, it is noted

■ This court "adhere[s] to th[e] core principle" that "[a] charge that fails to charge a requisite state of mind cannot be construed reasonably to state an offense and thus the charge is dismissed without prejudice because it violates due process." *Apollonio*, 130 Hawai'i at 359, 311 P.3d at 682. This principle applies even if the sufficiency of the charge is not challenged before the trial court.[21] *Id.; see also State v. Elliott*, 77 Hawai'i 309, 313, 884 P.2d 372, 376 (1994). Because the complaints omitted the requisite state of mind, the charges must be dismissed without prejudice.[22] *See Apollonio*, 130 Hawai'i at 359, 311 P.3d at 682.

### C.

■ Petitioners allege that the complaints should be dismissed <u>with</u> prejudice because new charges would be time barred under the relevant statute of limitations. However, the statute of limitations has been tolled in this case.

A violation of HAR § 13–261–10 is a petty misdemeanor. HRS § 701–107(4) (Supp. 2005) provides that "[a] crime is a petty misdemeanor ... if it is defined by a statute other than this Code that provides that persons convicted thereof may be sentenced to imprisonment for a term not to exceed thirty days." HAR § 13–261–5 (2002) provides that "(a) any person violating the rules in [HAR Chapter 261] shall be punished as provided in sections 6K–8 and 6K–8.5, [HRS]." HRS § 6K–8 (Supp.1997) states that "[a]ny person who violates any of the laws or rules applicable to the island reserve shall be

guilty of a petty misdemeanor and shall be fined not more than $1,000 or imprisoned not more than thirty days, or both, for each offense."

The statute of limitations for a petty misdemeanor is one year. HRS § 701–108(2)(f) (Supp.2006) ("A prosecution for a petty misdemeanor or a violation other than a parking violation must be commenced within one year after it is committed.") If this case were dismissed without prejudice, Petitioners maintain that the prosecution would be unable to re-file the charges, since more than one year has passed since Petitioners' 2006 entry onto the Reserve.

However, HRS § 701–108(6)(b) provides that "The period of limitation does not run" "[d]uring any time when a prosecution against the accused for the same conduct is pending in this State[.]" The Commentary on HRS § 701–108(6) provides that "Subsection (6) ... prevents any claim that the statute has run preventing retrial after reversal on appeal or dismissal for some reason which would not make retrial a matter of double jeopardy."

HRS § 701–108(6) thus indicates that the statute of limitations is tolled whenever "<u>a prosecution</u> against the accused for the same conduct is pending...." (Emphasis added.) This would include the period of time during which the prosecution against Petitioners has been pending in the instant case. Despite the fact that the charge against Petitioners was deficient, the prosecution was still "pending."[23] Thus, the statute of limitations

---

that based on the stipulated facts, Petitioners <u>did</u> actually enter the reserve, rather than just attempt to enter the reserve.

21. The complaints in the instant case were filed on August 22, 2006 and August 28, 2006. The articulation of the "core principle" that a charge must allege the requisite state of mind in *Gonzalez* and *Apollonio* was based on this court's decision in *Nesmith*, which was not filed until April 12, 2012. Petitioners filed their Application on September 16, 2013. Therefore, Petitioners could not have argued at trial that the complaints violated *Nesmith*.

22. In *Apollonio*, the defendant challenged the sufficiency of the charge for the first time on appeal. 130 Hawai'i at 358, 311 P.3d at 681. In

contrast, here Petitioners did not challenge the sufficiency of the charge at all. Nevertheless, the "core principle" announced in *Apollonio*, that a charge that does not allege a state of mind does not "alert [] defendants of precisely what they need[] to defend against to avoid a conviction" and thereby violates due process, applies. Moreover, the State concedes that the defects in the charge mandate dismissal without prejudice. Hence, it is appropriate for this court to dismiss the charge without prejudice based on the failure to allege a state of mind.

23. Petitioners maintain that since the charge was deficient, the prosecution was a "nullity" and therefore, the proceedings against Petitioners cannot be considered "a prosecution" for purposes of HRS § 701–108(6). However, despite

was tolled for the period beginning with the prosecution's filing of its Complaint in this action and ending when the court issues its judgment dismissing the case without prejudice. It is during this period that the prosecution can be considered to be "pending." The incident in this case took place on July 31, 2006. The prosecution filed the Complaint on August 22, 2006. The prosecution has been pending since then. Thus, approximately one month has run on the statute of limitations. Therefore, the statute of limitations does not bar the prosecution from refiling a complaint against Petitioners.[24]

## VI.

The issues raised by the Application have been briefed and the case will likely be retried on remand. *See id.* at *5 (noting that this court would reach the defendant's remaining arguments, because of the likelihood of retrial on remand); *see also Gonzalez*, 128 Hawai'i at 325, 288 P.3d at 799 (same). Because of the likelihood of retrial, we discuss the arguments raised.

## VII.

The KIRC was established pursuant to HRS § 6K–5 (Supp.2000), with the intent that the KIRC "establish criteria, policies, and controls for permissible uses within the island reserve[.]" The rules in Title 13, Chapter 261 of the HAR were promulgated pursuant to the KIRC's statutory authority. *See* HRS § 6K–5(9). HRS § 13–261–1(b) (2002) provides that the purpose of the rules is to "manage, preserve, restore, and protect the natural and cultural resources of the reserve; to regulate activities within the reserve; and to protect public health and safety." HRS § 13–261–1(b) states that "these rules shall apply to all persons entering the reserve." To reiterate, HRS § 13–261–5 (2002) prescribes the penalties for a violation of Chapter 261, specifically that "[a]ny person violating the rules in this chapter shall be punished as provided in [HRS] sections 6K–8[ [25]] and 6K–8.5 [26][.]"

As noted above, HAR § 13–261–10 sets forth the limits for entry onto the reserve, only allowing entrance by a person or vessel under specific, limited circumstances, which include when a person "[i]s specifically authorized to do so through written agreement approved by the commission[.]" To reiterate, HAR 13–261–11 details the process for obtaining approval by application to the KIRC. It states, *inter alia*, that "[e]ntrance into and activities within the reserve requested by applicants seeking to exercise traditional and customary rights and practices compatible with the law, shall be approved or disapproved by the commission after review and consultation with cultural practitioners[,]" and that "[p]rior to approving or disapproving any application, the commission shall determine whether the entrance and activities proposed by the application conform to the allowable activities described in § 13–261–13." HAR § 13–261–11(c) and (f).

## VIII.

Petitioners' arguments in its Application appear to be somewhat inconsistent with the

---

the deficiency of the charging instrument, the proceedings can themselves still be considered "a prosecution" against Petitioners. *See Black's Law Dictionary* 1341 (9th ed. 2009) (defining "prosecution" as (1) "The commencement and carrying out of any action or scheme" and (2) "A criminal proceeding in which an accused person is tried.").

**24.** The cases cited by Petitioner are distinguishable in that they are both from other jurisdictions and discuss the statute of limitations in civil cases.

**25.** HRS § 6K–8 is quoted *supra*.

**26.** HRS § 6K–8.5 (Supp.1997) provides, in relevant part, that:

(a) Except as otherwise provided by law, the commission is authorized to set, charge, and collect administrative fines, or bring legal action to recover administrative costs of the commission or the department, or payment for damages, or for the cost to correct damages resulting from a violation of chapter 6K or any rule adopted thereunder. The administrative fines shall be as follows:
 (1) For a first violation, by a fine of not more than $10,000;
 (2) For a second violation within five years of a previous violation, by a fine of not more than $15,000; and
 (3) For a third or subsequent violation within five years of the last violation, by a fine of not more than $25,000.
(Emphasis added.)

questions presented. However, in the interest of fully considering the legal issues presented by this case, and giving due weight to the "argument" portion of Petitioners' Application, their arguments are construed in the manner following.

The first question would be whether the ICA erred when it held that HAR §§ 13–261–10 and –11 [27] were constitutional. This question consists of three sub-issues, based on each of the constitutional rights Petitioners allege were infringed by the regulations, (1) the right to form an indigenous nation, (2) the right to engage in traditional and customary practices, and (3) the right to practice religion.

The second question would be whether the ICA improperly rested its holding on subject matter jurisdiction rather than analyzing Petitioners' "privilege" defense to penal liability, specifically that Petitioners were engaging in traditional and customary practices and therefore were not subject to liability under HAR § 13–261–10. [28]

## IX.

For analytical purposes, this second question, regarding Petitioner's "privilege" defense is addressed first, inasmuch as it resolves whether Petitioners should have been subject to penal liability under HAR § 13–261–10 in the first place. *See City and Cnty. of Honolulu v. Sherman*, 110 Hawai'i 39, 56 n. 7, 129 P.3d 542, 559 n. 7 (2006) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in the advance of deciding them." (internal quotation marks and citation omitted)).

## A.

■ First, it is clear that there was sufficient evidence adduced at trial to sustain

Petitioners' conviction. "'[T]he test on appeal in reviewing the legal sufficiency of the evidence is whether, when viewing the evidence in the light most favorable to the prosecution, substantial evidence exists to support the conclusion of the trier of fact.'" *State v. Agard*, 113 Hawai'i 321, 324, 151 P.3d 802, 805 (2007) (quoting *State v. Bui*, 104 Hawai'i 462, 467, 92 P.3d 471, 476 (2004)) (other citation omitted).

The elements of the offense in the instant case are (1) entering or attempting to enter into or remain, (2) within the Reserve, (3) without authorization as enumerated in HAR § 13–261–10(a)–(d). *See* HAR § 13–261–10. Since the state of mind for this petty misdemeanor is not established in the regulation, each element is established if the defendant acts intentionally, knowingly, or recklessly. *See* discussion, *supra*. As explained *supra*, Petitioners stipulated that (1) they entered the reserve, (2) they were not specifically authorized to enter into or remain on the reserve, (3) they did not make a written application for authorization to the commission (HAR § 13–261–10(b)), (4) they were not trolling in zone B (HAR § 13–261–10(c)), and (5) they did not enter the reserve to prevent probable loss of vessel or human life (HAR § 13–261–10(d)).

All of these elements were established with the requisite intent of intentionally or knowingly, as evidenced by the court's finding no. 1, stating that Petitioners traveled to the Reserve "for purposes of exercising and proclaiming the Reinstated Kingdom's property rights in the Kaho'olawe Island Reserve and its adjacent waters[,]" and finding no. 8, that Petitioners "intentionally chose to ignore and disregard the written application process. . . ." Thus, via stipulation, the prosecution established each element of the offense beyond a reasonable doubt. Petitioners' defense that the privilege for native Hawaiian

---

**27.** In their first question presented, quoted *supra*, Petitioners only challenge the constitutionality of HAR § 13–261–11. However, Petitioners arguments on this point appear to address the constitutionality of HAR § 13–261–10, which incorporates HAR § 13–261–11 by reference. Thus, the constitutionality of both regulations, operating together, is addressed.

**28.** In their second question presented, quoted *supra*, Petitioners ask whether the ICA failed to analyze HAR § 13–261–11 in light of fundamental rights, instead of deciding the case based on subject matter jurisdiction. This question overlaps with their first question, but the arguments section of Petitioners' Application raises different points, which appear related to the "privilege" defense.

practices applies in this case may be considered in this context.

## B.

As noted, the right to engage in traditional and customary Native Hawaiian practices is recognized under the Hawaiʻi Constitution art. XII, section 7. Pursuant to *Hanapi*, this court established a three-part test for "a defendant to establish that his or her conduct is constitutionally protected as a native Hawaiian right." 89 Hawaiʻi at 185–86, 970 P.2d at 493–94. First, the defendant must qualify as a ʻnative Hawaiian' within the guidelines set out in *PASH*. *Id.* at 185, 970 P.2d at 494. Second, the defendant "must establish that his or her claimed right is constitutionally protected as a native Hawaiian practice." *Id.* Third, the defendant "must also prove that the exercise of the right occurred on undeveloped or ʻless than fully developed property.' " *Id.*

The court's findings nos. 21 and 22, which are unchallenged by the parties, show that Petitioners satisfied the first requirement and the third requirement. As to the second requirement, it is not clear whether managing and controlling Kahoʻolawe is a customary and traditional native Hawaiian practice within the meaning of the Hawaiʻi Constitution, or that the religious practices Petitioners discuss in their testimony satisfy this standard. However, assuming, *arguendo,* that these activities do constitute constitutionally protected practices, Petitioners have satisfied the *Hanapi* test.

Under the "privilege defense," a balancing test is then applied to determine whether Petitioners' assertion of the native Hawaiian privilege will negate the conviction. *Pratt,* 127 Hawaiʻi at 216, 277 P.3d at 310. It must be determined whether Petitioners' conduct was reasonable, by balancing the State's interests in regulating Petitioners' activity with Petitioners' interest in visiting Kahoʻolawe. *See Pratt,* 127 Hawaiʻi at 218, 277 P.3d at 312.

At the hearing on the Motion to Dismiss, the State explained that HAR chapter 261 relating to the Kahoʻolawe Island Reserve "is in effect and enforced because of the threat to public health and safety that the Island and the waters of Kahoʻolawe possess." It quoted that portion of the historical note to HAR chapter 13–261, which states that "institutional controls are required because of the imminent threat to public health and safety which will continue to exist until the Kahoʻolawe Island Reserve has been cleared of unexploded ordnance and hazardous waste." Next, the State articulated that it "take[s] all access participants very seriously when they go to the Island because of all of the health and safety concerns that are still present on the Island and its surrounding waters." Thus, the record indicates that HAR § 13–261–10 is intended to limit the exposure of individuals to potential safety hazards in the Reserve.

On the other hand, Petitioners testified that they visited Kahoʻolawe with the purpose of reestablishing the Reinstated Hawaiian Government. They testified as follows:

Q. And ... the right you went there to exercise, am I correct, that that was the right to claim the—you were only at that point on that exercise claiming the limited right to claim management and control of Kahoʻolawe?

A. That's correct. And, of course, I felt even stronger than that, you know. I believe that that also—that we extended that exercise believing that we are going to initiate now the claims, you know, to Kahoʻolawe.

(Emphases added.)

Again assuming, *arguendo,* that Petitioners can establish that they were engaging in a traditional and customary native Hawaiian practice, their interest must be balanced against the State's interest to determine whether Petitioners are subject to penal liability in the instant case. In *Pratt,* after setting forth the interests of each party, the majority noted that "[w]hile Pratt has a strong interest in visiting [the restricted area], he did not attempt to visit in accordance with the laws of the State." 127 Hawaiʻi at 218, 277 P.3d at 312.

In this case, Petitioners similarly made no attempt to avail themselves of the applicable procedures to obtain lawful entry into the Reserve. Here, the regulations established a

clear method for lawful entry onto the Reserve and Petitioners made no showing that they would have been denied entry had they applied under HAR § 13–261–11. Under these circumstances, Petitioners did not "reasonably exercise[ ]" their constitutionally protected native Hawaiian rights, *see Hanapi*, 89 Hawai'i at 184, 970 P.2d at 493, because they did not apply for authorization from the commission. Therefore, the balance weighs in favor of the State's interest in protecting the health and safety of those individuals who travel to Kaho'olawe. Petitioners' activities then do not fall within a haven protecting them from criminal liability.

### C.

As part of this point of error, Petitioners also allege that the ICA incorrectly deemed their argument to be about whether the court had jurisdiction. Petitioners are correct that the ICA did consider whether the court had subject matter jurisdiction. *Armitage*, 2013 WL 1829663, at *2. However, the ICA additionally considered Petitioners' assertion of the privilege defense in Section II.B. of its SDO. *Id.* at *3. Thus, Petitioners cannot successfully argue that the ICA based its decision solely on subject matter jurisdiction rather than on the privilege defense.

### X.

Next, Petitioners' point of error alleging constitutional claims is addressed. Specifically, Petitioners challenge the constitutionality of the regulations in HAR chapter 13–261.

The preliminary issue is whether Petitioners have standing to challenge the constitutionality of the HAR chapter 13–261 regulations. Although not explicitly argued by the parties, this court must consider the issue of standing *sua sponte*, because " '[a] plaintiff without standing is not entitled to invoke a court's jurisdiction.' " *Sierra Club v. Hawai'i Tourism Authority ex rel. Bd. of Directors*, 100 Hawai'i 242, 59 P.3d 877 (2002) (quoting *Mottl v. Miyahira*, 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001)) (other citation omitted).

Because Petitioners were subject to penal liability pursuant to HAR § 13–261–10,

they have "a claim of specific present objective harm", *Ariyoshi*, 67 Haw. at 419, 689 P.2d at 765, and therefore have standing to challenge the constitutionality of that regulation. This much is clear. On the other hand, Petitioners stipulated at trial that they "did not make a written application to the commission for the authorization of entrance into and activity within the reserve." This stipulation establishes that Petitioners did not attempt to follow the procedures set forth in HAR § 13–261–11 to obtain lawful entry into the Reserve; Petitioners thus may not have standing to argue that HAR § 13–261–11 is unconstitutional.

The general rule is that "[w]here restraints imposed act directly on an individual or entity and a claim of specific present objective harm is presented, standing to challenge the constitutionality of an ordinance or statute exists." *State v. Bloss*, 64 Haw. 148, 151, 637 P.2d 1117, 1121 (1981), *cert. denied*, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982) (citing *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975)) (other citation omitted). This standing requirement is termed the "rule against vicarious assertion of constitutional rights." *Tauese v. State, Dep't of Labor & Indus. Relations*, 113 Hawai'i 1, 28, 147 P.3d 785, 812 (2006). "One must show that as applied to him the statute is constitutionally invalid." *Ariyoshi*, 67 Haw. at 419, 689 P.2d at 765 (citing *State v. Marley*, 54 Haw. 450, 509 P.2d 1095 (1973)). Thus, for example, a criminal defendant cannot challenge the constitutionality of one subsection of a statute where he was charged under a different subsection. *State v. O'Brien*, 5 Haw.App. 491, 494, 704 P.2d 905, 909, *aff'd*, 68 Haw. 38, 704 P.2d 883 (1985).

To the extent that Petitioners challenge HAR § 13–261–11 as unconstitutional, Petitioners would lack standing to do so, inasmuch as they never followed the prescribed procedures, and thus were not subject to HAR § 13–216–11. Since they never attempted to use the application procedure, they cannot claim that the specifics of the application procedures under HAR § 13–216–11, including review by a "cultural prac-

titioner," HAR § 13–216–11(f), are unconstitutional as applied to them.

 However, there is an exception for bringing constitutional challenges in the First Amendment area, pursuant to the overbreadth doctrine. *See Tauese*, 113 Hawai'i at 28, 147 P.3d at 812. That doctrine allows a party whose own rights are not violated to challenge the constitutionality of an ordinance upon showing that it abridges the protected speech of persons not before the court. *State v. Bloss*, 64 Haw. 148, 151 n. 6, 637 P.2d 1117, 1121 n. 6 (1981). Although Petitioners assert First Amendment rights, specifically, the right to practice their religion, as explained *infra*, their actions do not constitute "protected speech." Therefore, this exception is <u>not</u> available to Petitioners to challenge to the constitutionality of HAR § 13–216–11.

Petitioners constitutional arguments are therefore limited to the constitutionality of HAR § 13–216–10, because they cannot demonstrate a "specific present objective harm" based on HAR § 13–261–11. Had Petitioners attempted to follow the application process, then they would have had standing to challenge the constitutionality of HAR § 13–261–11. However, those are not the facts presented by this case. Thus, Petitioner's challenge is limited to HAR § 13–261–10. Nevertheless, the process set forth in HAR § 13–261–11 will be addressed where necessarily implicated in the analysis that follows.

## XI.

As to the merits of their constitutional claims, to reiterate, Petitioners apparently argue that HAR § 13–261–10, the regulation they were charged with violating, is unconstitutional for three reasons. To repeat, they maintain that HAR § 13–261–10 abridged their fundamental rights to (1) form an indigenous nation; (2) engage in traditional and customary practices; and (3) practice their religion. According to Petitioners, their right to enter the Reserve to exercise fundamental rights cannot "constitutionally be subject to an undefined review by undefined cultural practitioners[.]"

 " '[T]his court reviews questions of constitutional law de novo, under the "right/ wrong" standard, and thus, exercises its own independent constitutional judgment based on the facts of the case.' " *Kaho'ohanohano v. State*, 114 Hawai'i 302, 339, 162 P.3d 696, 733 (2007) (quoting *In re Guardianship of Carlsmith*, 113 Hawai'i 236, 239, 151 P.3d 717, 720 (2007) (other citation omitted)). Furthermore, this court has " 'long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional principle is to give effect to that intent.' " *Id.* (quoting *Save Sunset Beach Coal. v. City & Cnty. of Honolulu*, 102 Hawai'i 465, 474, 78 P.3d 1, 10 (2003) (other citation omitted)).

### A.

 First, Petitioners allege that their right to form an indigenous nation was abridged. Petitioners maintain that the right of the Native Hawaiian people to reestablish an autonomous sovereign government is a fundamental right. While the Hawai'i State Legislature has in the past recognized the potential for a sovereign native Hawaiian government to be recognized, *see, e.g.,* 1994 Haw. Sess. Laws Act 200, § 1 at 479 [29], Petitioners fail to establish that the right to form a sovereign native Hawaiian nation is a "fundamental right."

In their Application, Petitioners rely on Gates' testimony that the process of building an indigenous native Hawaiian Nation is constitutionally protected under Article XII, section 7 of the Hawai'i Constitution. However, Article XII offers protection for "all rights,

---

29. Act 200, section 1 provided, in part, that:

 SECTION 1. *Findings.* The legislature through Act 359, Session Laws of Hawai'i 1993, recognized the unique status that the native Hawaiian people bear to the State of Hawai'i and to the United States. The Hawaiian sovereignty advisory commission was established to seek counsel from the native Hawaiian people on <u>how to facilitate the efforts to be governed by an indigenous sovereign nation of their own choosing.</u>
 1994 Haw. Sess. Laws Act 200, § 1 at 479 (emphasis added).

customarily and traditionally exercised for subsistence, cultural and religious purposes...." This constitutional provision has never been extended beyond rights deemed to have been "customarily and traditionally" practiced by native Hawaiians. Art. XII, section 7 does not create a separate, additional right to nation-building, as Petitioners appear to contend.

Moreover, Petitioners' theory of nation-building as a fundamental right under the ICA's decision in *Lorenzo* does not appear viable. *Lorenzo* held that, for jurisdictional purposes, should a defendant demonstrate a factual or legal basis that the Kingdom of Hawaiʻi "exists as a state in accordance with recognized attributes of a state's sovereign nature[,]" and that he or she is a citizen of that sovereign state, a defendant may be able to argue that the courts of the State of Hawaiʻi lack jurisdiction over him or her. 77 Hawaiʻi at 221, 883 P.2d at 644. Thus, *Lorenzo* does not recognize a fundamental right to build a sovereign Hawaiian nation. Further, it does not set forth the process for the creation of a sovereign Hawaiian nation, but only indicates that this State's courts would be amenable to an argument that they lack jurisdiction over certain individuals subject to a new sovereign nation, in the event that such a sovereign nation was recognized by the United States government and internationally. *See id.*

 Finally, Petitioners fail to establish that 1993 U.S. Public Law 103 (the "Apology Resolution") created a "fundamental right." Petitioners do not cite to the text of the Apology Resolution or any other references in support of their assertion. In 1993, Congress adopted the Apology Resolution to acknowledge and "express its deep regret" for the United States' active role in the illegal overthrow of the Hawaiian monarchy in the late nineteenth century, while disclaiming that the resolution was "intended to serve as a settlement of any claims against the United States." P.L. 103–150, 107 Stat. 1510 (1993). In *Office of Hawaiian Affairs v. HCDCH*, 117 Hawaiʻi 174, 177 P.3d 884 (2008), this court held that the Apology Bill gave rise to the State's fiduciary duty to preserve ceded lands in trust, until such time as the unrelin-

quished claims of the native Hawaiians were resolved. 117 Hawaiʻi at 195, 177 P.3d at 905. The U.S. Supreme Court reversed this court, holding that the Apology Resolution did not confer substantive rights or have a substantive legal effect. *Hawaiʻi v. Office of Hawaiian Affairs*, 556 U.S. 163, 164, 129 S.Ct. 1436, 173 L.Ed.2d 333 (2009). Thus, the Apology Bill cannot serve to support a fundamental right to nation-building, as Petitioners allege.

### B.

 An alternative construction of Petitioners' alleged sovereign nation-building right would be to construe it within the constitutional right to freedom of speech. Although Petitioners do not explicitly state that this is a freedom of speech claim, they cite to numerous cases where freedom of speech was at issue, including making arguments related to "prior restraints" and "[s]ymbolic expression."

On this issue, the court properly decided in conclusion no. 14 that Petitioners' "purpose to claim and manage, control and subsequently occupy Kahoʻolawe involved conduct <u>outside the scope of any first amendment right to freedom of speech</u>." (Emphasis added.) In this case, Petitioners adduced evidence on their Motion to Dismiss that managing and controlling Kahoʻolawe was an important part of exercising their sovereignty, and that they sought recognition as the sovereign native Hawaiian entity. However, Petitioners' actions do not necessarily amount to "speech".

Several Hawaiʻi cases support this conclusion. In *State v. Jim*, 105 Hawaiʻi 319, 97 P.3d 395 (App.2004), for example, the defendant claimed that his physical presence preventing county water supply workers from investigating an illegal water line was a protest. 105 Hawaiʻi at 326, 97 P.3d at 402. The ICA held that the defendant's conduct, physically obstructing lawful work, did not constitute speech for which first amendment protections were available. *Id.* at 334, 97 P.3d at 410.

In *Kleinjans v. Lombardi*, 52 Haw. 427, 478 P.2d 320 (1970), this court considered the

propriety of an injunction prohibiting certain forms of student demonstrations, specifically occupation of the university chancellor's office. 52 Haw. at 428, 478 P.2d at 322. *Kleinjans* held that by occupying the university office, the defendants were engaged in conduct that did not constitute speech because, "[t]heir protest did not take the form of a public rally but instead involved the occupation of the private office of a university official. There could not be any good faith claim that this area was open to the public for the purpose of expressing dissident ideas." *Id.* at 433, 478 P.2d at 324.

Similarly, here, Petitioners cannot claim that the Reserve was an area "open to the public for expression of ideas." *Id.* Thus, although to some extent Petitioners apparently intended to communicate through their presence on Kaho'olawe, it cannot be deemed "speech" for purposes of the First Amendment freedom of speech protections. *See United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). Therefore, Petitioners' claim that the regulations unconstitutionally abridged their right to establish a sovereign nation is incorrect.

## XII.

Second, Petitioners argue abridgment of their constitutional right under the Hawai'i Constitution to engage in traditional and customary native Hawaiian practices. This right is unique to this State, and therefore an alleged abridgment of this right is analyzed under Hawai'i's jurisprudence. *See, e.g., Ka Pa'akai O Ka'Aina v. Land Use Comm'n,* 94 Hawai'i 31, 7 P.3d 1068, 1083 (2000) ("'[T]he State is obligated to protect the reasonable exercise of customarily and traditionally exercised rights of Hawaiians to the extent feasible.'") (emphasis omitted) (quoting *PASH,* 79 Hawai'i at 450 n. 43, 903 P.2d at 1271 n. 43).

This court has constructed the right to engage in traditional and customary native Hawaiian practices as "an attempt on the part of the framers of [HRS § 1–1] to avoid results inappropriate to the isles' inhabitants by permitting the continuance of native understandings and practices which did not unreasonably interfere with the spirit of the common law." *Kalipi v. Hawaiian Trust Co.,* 66 Haw. 1, 10, 656 P.2d 745, 751 (1982). *Kalipi* further stated that "the retention of a Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area." *Id.* Accordingly, in *Ka Pa'akai O Ka'Aina,* it was held that the State and its agencies "may not act without independently considering the effect of their actions on Hawaiian traditions and practices." 94 Hawai'i at 46, 7 P.3d at 1083.

In this case, the KIRC did consider the effect of its actions on Hawaiian traditions and practices when it promulgated HAR §§ 13–261–10 and –11. This consideration is apparent in the exception in HAR §§ 13–261–10 and –11 specifically mentioning "[e]ntrance into and activities within the reserve requested by applicants seeking to exercise traditional and customary rights and practices compatible with the law[.]" HAR § 13–261–11. Further, as discussed *supra,* with respect to Petitioners' "privilege defense," the State's interest as balanced against the potential harm to Petitioners' ability to engage in native Hawaiian traditional and customary practices weighs in favor of the State. As a result, Petitioners cannot claim that HAR §§ 13–261–10 or –11 is unconstitutional on this basis.

## XIII.

Third, Petitioners state that their right to practice religion was infringed by the subject regulations. This argument may be analyzed under the framework of the free exercise clause. *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"); Haw. Const. art. I, § 4 ("No law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof[.]").

### A.

In *State v. Sunderland,* 115 Hawai'i 396, 168 P.3d 526 (2007), this court discussed at length challenges to laws on the grounds that they violate the constitutional right to free exercise of religion. 115 Hawai'i at 401–404, 168 P.3d at 531–534. It was concluded that, in accordance with the U.S. Supreme Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), "a generally applicable law is not subject to First Amendment attack <u>unless</u> (1) it interferes with 'the Free Exercise Clause in conjunction with other constitutional protections,' or (2) it <u>creates a mechanism that calls for 'individualized governmental assessment of the reasons for the relevant conduct[ ]'</u> (*i.e.,* individualized exemptions)." *Sunderland,* 115 Hawai'i at 404, 168 P.3d at 534 (emphases added) (quoting *Smith,* 494 U.S. at 884, 110 S.Ct. 1595). *Sunderland* held that the criminal statute making it an offense to knowingly possess marijuana, HRS § 712–1249 (1993), was generally applicable, and therefore, following *Smith,* was not subject to a First Amendment attack. *Id.*

In this case, although HAR § 13–261–10 initially seems like a "generally applicable law", similar to the generally applicable criminal statute that was at issue in *Sunderland,* the regulation also appears to "create[ ] a mechanism that calls for individualized government assessment of the reasons for the relevant conduct," *id.* (internal quotation marks and citations omitted), through its reference to HAR § 13–261–11. To reiterate, HAR § 13–261–10(a) states that entrance to the reserve is not permitted unless "specifically authorized" and that the process for that authorization is set forth in HAR § 13–261–11. Although, as noted, Petitioners lack standing to directly challenge the constitutionality of HAR § 13–261–11, the language from *Sunderland* states that *Smith* will apply unless the law "<u>creates</u>" a mechanism for individualized assessment. *Id.* (emphasis added). A mechanism is "created" via HAR § 13–261–11 for the KIRC to individually assess whether to allow a person or group to enter the Reserve.

Where there is an individualized assessment, as in this case, then the U.S. Supreme Court's test set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), is applicable. *See Smith,* 494 U.S. at 884, 110 S.Ct. 1595 ("The *Sherbert* test ... was developed in a context that lent itself to individualized government assessment of the reasons for the relevant conduct."). Under the *Sherbert* test, if a particular law imposes a burden upon the free exercise of religion, judicial scrutiny is triggered, the regulation must be justified with a compelling government interest, and the government has the burden of demonstrating "that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." *Id.* at 404–407, 83 S.Ct. 1790.

To the extent that Petitioners and the State argue that various other presumptions should apply with respect to determining the constitutionality of the regulation, it is noted that under the circumstances presented by this case, the *Sherbert* test is consistent with the general proposition advanced by Petitioners, and articulated in *Child Support Enforcement Agency,* quoted *supra.* That proposition is that the presumption of statutory constitutionality does not apply to laws that classify on the basis of suspect categories or impinge on fundamental rights expressly or impliedly granted by the constitution. *Child Support Enforcement Agency v. Doe,* 109 Hawai'i 240, 246, 125 P.3d 461, 467 (2005) (citation omitted). "Such laws are presumed to be <u>unconstitutional</u> unless the state shows compelling state interests which justify such classifications, and that the laws are narrowly drawn to avoid unnecessary abridgments of constitutional rights." *Id.* (emphasis in original) (citing *Baehr v. Lewin,* 74 Haw. 530, 571–72, 852 P.2d 44, 63–64 (1993)) (other citations omitted). This description of the constitutional strict scrutiny test is consistent with the test applied by the U.S. Supreme Court in *Sherbert.* *See Sherbert,* 374 U.S. at 404–407, 83 S.Ct. 1790.

### B.

In applying the strict scrutiny analysis, the first question is whether HAR § 13–

261–10 burdened the free exercise of religion. On this point, the court concluded that Petitioners "did not prove their deprivation of a right to free exercise of religion, because their testimony and evidence failed to establish 'that such practice is an integral part of a religious faith and that the prohibition ... results in a virtual inhibition of the religion or the practice of the faith." (Emphasis in original.) (Quoting *Blake*, 5 Haw.App. at 417, 695 P.2d at 340 (citation omitted).)

It is initially observed that this standard from *Blake* cited in the court's conclusions is not applicable to determining whether HAR § 13–261–10 burdened Petitioners' exercise of religion. Specifically, Petitioners need not show that the regulation resulted in "a virtual inhibition of the religion or practice of the faith." *Blake*, 5 Haw.App. at 417, 695 P.2d at 340. In *Blake*, the ICA adopted this standard from a California Court of Appeal case, *People v. Mullins*, 50 Cal.App.3d 61, 123 Cal.Rptr. 201 (1975), which considered the constitutionality of a generally applicable regulation. The *Mullins* court interpreted the first step in the *Sherbert* test to require two separate determinations—first, whether "the statute imposes any burden upon the free exercise of the religion whose religious beliefs the defendant asserts he embraces and [second,] whether the defendant actually engaged in good faith in that religion." 123 Cal.Rptr. at 207. *Mullins* went on to state that "we note, here, that where it is claimed that the use of a narcotic, drug or an hallucinogen which the state proscribes is a religious practice, it must be established that such practice is an integral part of a religious faith and that the prohibition of the narcotic, drug, or hallucinogen results in a virtual inhibition of the religion or practice of the faith." *Id.* (emphases added). Thus, the "integral part" and "virtual inhibition of the religion or practice of the faith" requirements were limited to cases where the use of

a regulated or prohibited narcotic, drug or hallucinogen was at issue. *See id.* *Blake* properly applied these requirements because in *Blake*, the defendant claimed that the use of marijuana was a religious practice. 5 Haw.App. at 417, 695 P.2d 336. However, in this case, there is no claim of a use of a narcotic, drug, or hallucinogen, and thus the standards from *Blake* cited by the court in its conclusion no. 19 are not applicable.

Instead, this court has held that " 'it [is] necessary to examine whether or not the activity interfered with by the state was motivated and rooted in a legitimate and sincerely held religious belief [and] whether or not the parties' free exercise of religion had been burdened by the regulation[.]' " *Dedman v. Bd. of Land & Natural Res.*, 69 Haw. 255, 260, 740 P.2d 28, 32 (1987) (quoting *State ex rel. Minami v. Andrews*, 65 Haw. 289, 291, 651 P.2d 473, 474 (1982)). In this case, the legitimacy of Petitioners' religious belief need not be addressed.[30] Similarly, it may be assumed that Petitioners' activity was rooted in a legitimate and sincerely held belief. However, it appears that Petitioners cannot show that their free exercise of religion was burdened by HAR § 13–261–10. Despite Petitioners' argument in their brief that they traveled to Kaho'olawe "to allow representatives of the Reinstated Hawaiian Government to build a heiau and perform a prayer on the site," among other things, the record does not support a conclusion that Petitioners' exercise of religion was burdened by the limitations imposed by the government on travel to Kaho'olawe.

First, a review of the record suggests that Petitioners engaged in religious practices as part of their purpose of managing and controlling Kaho'olawe and/or establishing a native Hawaiian sovereign entity, but that such practices did not have to take place on Kaho'olawe as part of the practice of their

---

30. With respect to his religion, Noa testified as follows:

[Counsel for Petitioners]: Do you also practice a religion?

[Noa]: You know, that's an interesting point, yeah, religion. And in Hawai'i, I think if you recognize our Constitutions in the Kingdom, it basically said that every man, person, could practice his own religion. Okay. So as far as

Hawai'i having, I guess you could say a central religion, yeah, I think that it evolved through the constitutions. And I thought that was quite amenable on behalf of our monarchs to make that happen in Hawai'i. Because prior to that there was definitely a religion that was practiced in Hawai'i, and it was called the Kaku system. And that in itself was religious practice.

religion. Noa testified that Petitioners had planned to undertake a religious ceremony on Kahoʻolawe in connection with their presence on the Reserve, as follows:

[Noa]: And we went [to Kahoʻolawe], again, understanding that our intent is to be recognized, yeah, who we are as a people, as a nation, to exercise our right as a nation.

[Counsel for Petitioners]: Okay. And that-the right you went there to exercise, am I correct, that that was the right to claim the—you were only at that point on that exercise claiming the limited right to claim management and control of Kahoʻolawe?

[Noa]: That's correct. And, of course, I felt even stronger than that, you know. I believe that that also—that we extended that exercise believing that we are going to initiate now the claims, you know, to Kahoʻolawe.

[Counsel for Petitioners]: Right.

And when you got there, did you undertake any sort of a religious endeavor or ceremony?

[Noa]: In our traditional practice, in our culture, it is—it is well understood that when you have an event, be it a small event or a large event, you always pay respect, okay, to your ancestors, to your various Gods that our religion has, or even just to Akua itself.

So when we—before we left, we already had a plan that we would institute protocol. And a part of protocol is to ask, yeah, our ancestors to welcome us to the islands, and we do that through prayer. And that's what we did when we arrived, okay. And a part of our—a part of our traditional protocol in our case, because we are a nation that's coming into being, we had already decided that we would build an ahu to signify our arrival, our arrival, our accomplishment.

[Counsel for Petitioners]: And, for the record, what is an "ahu"?

[Noa]: An "ahu" is an altar. Okay. You can have personal ahus, you can have community ahus, and you can have national ahus. Okay. Some of the national ahus are referred to as hales.

But, this is, like I said, a sacred place. This is where you reveal your sincerity, you invoke support from your ama kuas, from your ancestors. This is where you come to give thanksgiving to provide hoʻokupu.

[Counsel for Petitioners]: And was there, among either just you or collectively, was there a religious calling to do this when you got there, or—

[Noa]: Most definitely. I mean, it's a part of us. You know, when you lose an identity, you lose a nation, you lose who you are. So to maintain that, you have only the spirit, you know. You can look at me physically, but if I don't have a country, hell, I believe—excuse my language, I believe that—I'm not here. Spiritually I'm here, but physically I have to be reconnected back to my country. Who am I? I am a Hawaiian. I'm a Kanaka maoli, Native Hawaiian, and today I cannot claim that. You know, so I have to design, you have to build our nation so that we can fix that problem. It's a problem that we live with. I don't care who you are as a Kanaka, you have that problem, and that is you cannot claim sovereignty in your own country until you fulfill that obligation. And, I mean, I believe we have Kanakas sitting right here in this courtroom who truly believe that we will never acquire independence.

You know, that's something that I live with, I understand, but they need to respect what we believe in, and that's what we do.

[Counsel for Petitioners]: Now, I want to get back to this ceremony for a moment, the religious ceremony on the island.

You have talked about our religion, and to—in your knowledge and understanding, was that a—I think you mentioned a traditional and customary religious ceremony?

[Noa]: You know, it is *a customary practice,* okay.

[Counsel for Petitioners]: Okay. And prior to 1893, do you believe that was practiced on the Island of Kahoʻolawe?

[Noa]: Most certainly.

[Counsel for Petitioners]: That type of ceremony?

[Noa]: Definitely. There are ahus set on the island. Personally I have not seen those, but I have been shown myself. I've been shown photographs. They even have—Kahoʻolawe also represents, this is—forgive me for not remembering, but there is a point on Kahoʻolawe that all the navigators, yeah, that sail in the Pacific from Hawaiʻi go back to the Pacific will go to Kahoʻolawe and they will arrive. Kealaikahiki is a channel, and there is point on Kahoʻolawe, and that point is a heiau, it has an ahu that was built centuries ago, and that's for our sailing purposes, our navigators, you know. They would go there and offer up their hoʻokupus, their services, so they would receive protection, the strength that they would need. And the island has many, many altars.

. . . .

[Counsel for Petitioners]: When you went to Kahoʻolawe, did you go there as an individual with the intention of breaking some state regulation, or did you go there primarily for the purposes that you've testified to today?

[Noa]: No. We went there primarily for the purposes that I speak about today, that once we fulfilled our obligation as a nation, I truly believe that it is now the nation's responsibility to exercise, you know, that sovereign powers.

(Emphases added.)

While the foregoing testimony may establish that Petitioners were engaging in customary and traditional practices on the island, including religious practices, the testimony indicates that the practices were in connection with Petitioners' sovereign nation-building activity. For example, Noa testified that "when you have an event" you undertake certain activities, and that "as part of our protocol" "because we are a nation that's coming into being, we had already decided that we would build an ahu to signify our arrival." (Emphasis added.) Noa further testified that there are many altars on Kahoʻolawe, but he did not testify that Petitioners needed to go to Kahoʻolawe because of these altars or any other religiously significant areas.

■ Second, even if Petitioners had to travel to Kahoʻolawe in order to practice their religion, it does not appear that government regulations HAR §§ 13–261–10 and –11, requiring a written application process to go to the island, created a <u>substantial</u> burden on Petitioners' practice of religion. *See State v. Adler*, 108 Hawaiʻi 169, 177, 118 P.3d 652, 660 (2005) ("Appellants must show a 'substantial burden' on religious interests.") (citation omitted); *see also Sherbert*, 374 U.S. at 406, 83 S.Ct. 1790 ("We must next consider whether some compelling state interest . . . justifies the substantial infringement of appellants First Amendment right."). HAR § 13–261–11 provides that written application forms may be obtained from the commission office, and the written application requires fairly standard information, including, *inter alia*, the number and names of individuals who will participate in the requested entrance, a signed liability waiver, description of the purposes and activities associated with the entrance, and information pertinent to the exercise of traditional and customary rights, if such rights are claimed. *See HAR* 13–261–11(a). Such a process cannot be said to "substantially burden" the exercise of religion. While " '[t]he door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious <u>beliefs</u> as such [ ]' ", *Koolau Baptist Church v. Dep't of Labor & Indus. Relations*, 68 Haw. 410, 718 P.2d 267 (1986) (quoting *Sherbert*, 374 U.S. at 402, 83 S.Ct. 1790 (emphasis in original)), " 'the freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions[,]' " *id.* (quoting *Braunfeld v. Brown*, 366 U.S. 599, 603, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961)).

## C.

Having concluded that Petitioners practice of religion was not substantially burdened by HAR §§ 13–261–10 and –11, the remainder of the *Sherbert* test need not be applied. Therefore, there is no need to determine if the regulations are justified with a compelling state interest or whether the regulations are narrowly tailored to satisfy that interest. Accordingly, under these circumstances, the regulations under HAR §§ 13–261–10 and –

11 do not unconstitutionally burden Petitioners' right to practice their religion.

## XIV.

Based on the foregoing, the July 17, 2013 judgment of the ICA and the April 3, 2009 judgments of the court as to Armitage, Kahookele, and Noa are vacated, and the case is remanded to the court for disposition consistent with this opinion.

Concurring and Dissenting Opinion by RECKTENWALD, C.J., in which NAKAYAMA, J., joins.

For the reasons set forth in my dissenting opinion in *State v. Apollonio,* 130 Hawai'i 353, 364–371, 311 P.3d 676, 687–694, I respectfully dissent from the majority's conclusion that the lack of a mens rea allegation in the charges requires that the cases be dismissed without prejudice despite the defendants' lack of objection to the sufficiency of the charges. In my view, where a defendant does not object to a deficient charge in the trial court, the defendant is required to show how he or she was prejudiced by the error.

In the instant case, the defendants have not demonstrated how they were prejudiced by the deficient charge. To the contrary, the circuit court's unchallenged findings of fact state that the defendants purposefully entered Kaho'olawe Island Reserve and intentionally disregarded the process for seeking authorization to enter the Reserve set forth in Hawai'i Administrative Rules § 13–261–11. These facts are binding on this court. *State v. Pacquing,* 129 Hawai'i 172, 186 n. 18, 297 P.3d 188, 202 n. 18 (2013). Moreover, the defendants conceded these facts in the trial court. Accordingly, the defendants cannot plausibly assert that the deficient charge prevented them from defending against the case based on the lack of a culpable state of mind.[1] Respectfully, the majority's application of the *Apollonio* rule in these circumstances unnecessarily pro-

longs the final resolution of this case[2] with no discernible benefit to the defendants or the public.

Accordingly, I respectfully dissent from the majority's decision to remand for dismissal of the charges. However, I concur in the majority's discussion of the defendants' arguments on the merits, and would affirm their convictions for the reasons set forth therein.

---

1. Similarly, the other deficiencies alleged by the State in its supplemental brief would not warrant vacating the defendants' convictions. It is apparent from the record that the defendants knew the charges stemmed from their entry into Kaho'olawe Island Reserve, and that their entry

was not authorized by the Kaho'olawe Island Reserve Commission.

2. As noted by the majority, the complaints in the instant case were filed over seven years ago in August 2006.